Concerning the Application for Underground Water Rights, for Change in Water Rights and for Approval of a Plan for Augmentation Including Exchange Involving Tributary Water from Cherry Creek, a Tributary of the South Platte River, and Nontributary Water from the Dawson, Denver, Arapahoe and Laramie–Fox Hills Nontributary Aquifers of James L. ORR; Cogito N.V., a Netherlands Antilles corporation; The Erwin Interests, Inc., a Texas corporation; Lester A. Dixon, Jr.; Joann Dixon Morrow; Leslie E. Dixon, personal representative of the Estate of Bruce H. Dixon, deceased; and Cottonwood Water and Sanitation District, Appellants,

v.

ARAPAHOE WATER AND SANITATION DISTRICT, Parker Properties Joint Venture, Denver Southeast Suburban Water and Sanitation District, Inverness Water and Sanitation District, City of Aurora, Ronald Kmieciak, Clair Mahr, Woodman Brothers Landscape and Nursery, Inc., the Parker Water and Sanitation District, Alan Berryman as the Division Engineer and Dr. Jeris A. Danielson as the State Engineer, T.C.D. North, Inc., Fred and Gunhild Dransfeldt and Stroh Ranch Development, Appellees.

No. 86SA132.

Supreme Court of Colorado.

April 11, 1988.

Rehearing Denied May 16, 1988.

Saunders, Snyder, Ross & Dickson, P.C., John M. Dickson, Deborah L. Freeman, Denver, for appellants.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Peggy Ventura, Asst. Atty. Gen., Denver, for Alan Berryman, as Division Engineer, and Dr. Jeris A. Danielson, as State Engineer.

Carlson, Hammond & Paddock, William A. Paddock, Denver, for Stroh Ranch Development.

John M. Dingess, Rebecca L. Shandrick, Aurora, for City of Aurora.

Moses, Wittemyer, Harrison & Woodruff, P.C., Robert E.L. Beebe, James R. Montgomery, Boulder, for Inverness Water & Sanitation Dist. and Denver Southeast Suburban Water & Sanitation Dist.

Stephen T. Williamson, Louisville, for Arapahoe Water and Sanitation Dist. and Parker Properties Joint Venture.

QUINN, Chief Justice.

This case involves the interpretation of a 1969 decree, entered pursuant to the Adjudication Act of 1943, §§ 148–9–1 to –27, 7 C.R.S. (1963), which changed the points of diversion of certain decreed water rights from surface ditches to wells. In 1981, the applicants, Cottonwood Water and Sanitation District, James L. Orr, Cogito N.V., Erwin Interests, Inc., Lester A. Dixon, Jr., Joann Dixon Morrow, and Leslie E. Dixon, in her capacity as personal representative of Bruce H. Dixon, filed an application for a determination with respect to a change in water right in Water Court Division 1 pursuant to the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, 15 C.R.S. (1973 & 1987 Supp.). The application sought a change in use from irrigation to municipal purposes. The water court granted the application, but

interpreted the 1969 decree to limit the new points of diversion to the amount of water historically used at the original decreed points of diversion. We affirm the judgment of the water court.

## I.

A summary of the factual and procedural history of this case is necessary to an understanding of the issues raised in this appeal. In 1950, the Dixon family acquired the Diamond Over D Ranch located approximately two and one-half miles northwest of Parker, Colorado. The deed to the ranch also conveyed to the Dixons the following water rights:

a. An undivided one-half of the water right decreed to Fifty Nine No. 1 Ditch, being 3.64 cubic feet of water per second of time out of Cherry Creek with date of appropriation of May 2, 1862 and Priority No. 7 in Water District No. 8 and Irrigation Division No. 1 of the State of Colorado as set forth in that certain decree of the District Court of the Fourth Judicial District sitting in this county which was entered on December 10, 1883.

b. An undivided one-half of the water right decreed to The Boss Ditch, being 2.36 cubic feet of water per second of time out of Cherry Creek, with date of appropriation of July 30, 1869 and Priority No. 44 in Water District No. 8 and Irrigation Division No. 1 of the State of Colorado as set forth in that certain decree of the District Court of the Fourth Judicial District sitting in this county which was entered on December 10, 1883.

c. An undivided one-half of the water right decreed to The Gillman Ditch, being 4.95 cubic feet of water per second of time out of Cherry Creek, with date of appropriation of February 28, 1880 and Priority No. 118 in Water District No. 8 and Irrigation Division No. 1 of the State of Colorado as set forth in that certain

decree of the District Court of the Fourth Judicial District sitting in this county which was entered on December 10, 1883.

d. All of the water right decreed to the Parker Ditch for 3 cubic feet of water per second of time out of Cherry Creek, with date of appropriation of January 1, 1885 and Priority No. 146 in Water District No. 8 and Irrigation Division No. 1 of the State of Colorado as set forth in that certain decree of the District Court of the Fourth Judicial District sitting in this County which was entered on March 3, 1890.

From the time of these decrees until the mid–1930s, the water rights had been used to irrigate portions of the property which would eventually comprise the Diamond Over D Ranch. In the mid–1930s, Cherry Creek flooded and destroyed the headgates of the ditches and portions of the ditches as well. The headgates were never reconstructed, and the property was not again irrigated until after the Dixon family purchased the land in 1950.

In 1953, the Dixons transferred ownership of the ranch and the water rights to Diamond Over D Ranch, Inc., a family-owned corporation. By 1963, Diamond Over D Ranch, Inc. had drilled seven irrigation wells on the property through which it diverted water pursuant to the water rights originally decreed to the four ditches. In 1969, Diamond Over D Ranch, Inc. filed a petition in the District Court of Douglas County to change the points of diversion from the four ditches to the seven wells.[1] A hearing was held on the petition on November 10, 1969. Lester Dixon, Jr., vice president of Diamond Over D Ranch, Inc., testified at the hearing that subsequent to the drilling of the wells the Dixon family had used the wells to divert water pursuant to the water rights originally decreed to the ditches, and had done so continuously and without objection from

---

1. The corporation's petition to change the points of diversion was filed under the Adjudication Act of 1943. §§ 148–9–1 to –27, 7 C.R.S. (1963). The Water Right Determination and Administration Act of 1969 was enacted during the pendency of the proceeding. Ch. 373, sec. 1, §§ 148– 21–1 to –45, 1969 Colo.Sess.Laws 1200. The case was completed under the 1943 Act, however, because section 148–21–44 of the 1969 Act required all pending proceedings to be completed by July 1, 1972 under the 1943 Act. § 148–21–44, 11 C.R.S. (1969 Perm.Supp.).

other water users. There was also testimony from a water engineer that a decree changing the points of diversion would have no adverse impact on other appropriators because diverting water through the wells would be the same as diverting water through the ditches. No evidence was presented at the 1969 hearing concerning the amount of land actually irrigated or the amount of water consumptively used in irrigating the land either through the ditches or the wells.

The district court in the 1969 proceeding made the following findings of fact:

The method of exercising the water rights which the Petitioner [Diamond Over D Ranch, Inc.] seeks to have confirmed by this action has been continuously used by the Petitioner and its predecessors for a number of years without injury to or objection by any other appropriator or any water administration official of the State of Colorado.

The modifications sought by the Petitioner are required to make the most flexible, efficient and economical use of the Petitioner's water rights.

The modifications in the points of diversion, if granted, will result in no change in the place or type of use of water; the rights will continue to be used for the irrigation of lands of the Petitioner which have been historically irrigated by use of said rights.

After finding that a decree changing the points of diversion would not injuriously affect the vested water rights of others, the court granted the decree changing the points of diversion and concluded as follows:

The Petitioner [Diamond Over D Ranch, Inc.], its successors and assigns as owners of the modified water rights may, in the exercise of any one or combination of two or more of said rights, divert water from the underflow of Cherry Creek at any single or a combination of two or more of the new, alternate points of diversion, provided that diversions under the priorities of said rights, shall not exceed the total amount of the Petitioner's interest in the Decrees as modified.

Diamond Over D Ranch, Inc. was dissolved in 1972 and undivided interests in the land and the water rights were conveyed to Lester Dixon, Jr., Joann Dixon Morrow, and Bruce Dixon. In 1979, the three Dixons entered into a contract to sell the land and water rights to Castlewood Corporation. The contract required Castlewood to purchase the land and the water rights in increments. As each increment was purchased, Castlewood Corporation sold the land and water rights to James Orr, Cogito N.V., and Erwin Interests, Inc., and they in turn sold it to Cottonwood Water and Sanitation District, which had been formed to provide water and sewer service to the lands formerly comprising the Diamond Over D Ranch.

In 1981, the applicants filed the present proceeding seeking, *inter alia,* a determination with respect to a change of water rights from irrigation to municipal uses for the seven wells which were diverting water pursuant to the 1969 decree.[2] Several parties filed statements of opposition to the application, including the State Engineer and various water and sanitation districts.[3] The water judge referred the application to

---

2. The municipal purposes included domestic use, irrigation, street cleaning, recreation, fire protection, manufacturing, and commercial and industrial uses. The application also sought approval of a plan for augmentation and exchange involving tributary water from Cherry Creek alluvium and nontributary water from the Dawson, Denver, Arapahoe, and Laramie–Fox Hills aquifers. Because the parties have appealed only from the portion of the water court's order concerning the change in water rights, our discussion is limited to that issue.

3. The objectors, in addition to the State Engineer, were: Arapahoe Water and Sanitation District; Denver Southeast Suburban Water and Sanitation District; Inverness Water and Sanitation District; Parker Water and Sanitation District; Parker Properties Joint Venture; City of Aurora; Ronald Kmieciak; Clair Mahr; Woodman Brothers Landscape and Nursery, Inc.; T.C.D. North, Inc.; Fred and Gunhild Dransfeldt; and Stroh Ranch Development.

a water referee, and a hearing was held before the referee in November and December, 1981. It was the applicants' position that the 1969 decree changing the points of diversion from the ditches to the wells confirmed the method and extent of irrigation practiced from 1956 to 1979 by the Dixons and Diamond Over D Ranch, Inc. as being a proper exercise of the water rights originally decreed to the four ditches and then transferred to the seven wells. In keeping with this position, Lester Dixon, Jr., testified that from 1956 to 1979 the Dixons and the family corporation diverted water through the wells to irrigate at least 310 acres of land used as a feedlot operation for raising steers. The parties agreed, pursuant to an oral stipulation, that the actual consumptive use of water from the seven wells was 682 acre feet per year.

It was the position of the objectors, however, that the 1969 decree changing the points of diversion had the effect of transferring to the wells the amount of water consumptively used through the ditches when the ditches were active. The objectors presented evidence that this amount of water was 282.8 acre feet per year. The applicants declined to present any evidence concerning the irrigation practices under the ditches, claiming that the 1969 decree changing the points of diversion was res judicata on their right to divert 682 acre feet of water per year to irrigate the 310 acres of land used in the feedlot operation.

The referee interpreted the 1969 decree as "transferring to the wells the irrigation practice as it existed when the ditches were active," and relied for that interpretation on the following language from the 1969 decree:

The modifications in the points of diversion, if granted, will result in no change in the place or type of use of water; the rights will continue to be used for the *irrigation of lands* of the Petitioner [Diamond Over D Ranch, Inc.] *which have been historically irrigated by use of said rights.*

(Emphasis added by referee). The referee then made the following findings concern-

ing the consumptive use from ditch irrigation during the period when the ditches were active:

| Ditch | Irrigated Acres | Consumptive Use Per Acre (Acre–Feet) | Annual Consumptive Use (Acre–Feet) |
|---|---|---|---|
| 59 No. 1 | 93.2 | 1.22 | 113.7 |
| Boss | 92.46 | 1.91 | 84.1 |
| Gillman | 54.12 | 1.57 | 85.0 |
| | | Total | 282.8 |

Since no evidence was presented concerning the fourth ditch, the Parker Ditch, the referee found that there had been no consumptive use from that ditch.

In approving the application for a change in use from irrigation to municipal purposes, the referee ruled that, since the applicants owned a half interest in the water rights decreed to the three ditches from which there had been a consumptive use of 282.8 acre feet per year, the applicants were entitled to withdraw 141 acre feet of water annually through the wells for municipal purposes, based on the priority dates applicable to the ditches, at the following rates:

| Ditch | Priority Date | Annual Amount of Water (Acre–Feet) |
|---|---|---|
| 59 No. 1 | May 2, 1862 | 57 |
| Boss | July 30, 1869 | 42 |
| Gillman | Feb. 28, 1880 | 42 |
| | Total | 141 |

In protesting the referee's ruling, the applicants initially claimed that the referee misinterpreted the 1969 decree which, in the applicants' view, authorized them to withdraw 682 acre feet of water annually through the seven wells, and next argued that the 1969 decree was res judicata on their right to divert this amount of water through the wells. Prior to the hearing before the water court, the parties stipulated that the referee's factual findings with respect to the irrigation practices and the consumptive use of water under the ditches "shall be deemed final and no additional evidence of irrigation practice on the subject property during these years shall be adduced."

The water court conducted a hearing on the protest. At the hearing Lester Dixon,

Jr., testified that from 1956 to 1979, before the ranch and the water rights were sold, the Dixons and the family corporation had used the wells to irrigate from 310 to 340 acres of land. Dixon also testified that no one had objected to their irrigation practices and that the State Engineer had not attempted to shut down their wells or curtail the extent of their irrigation. Harold Simpson, an assistant state engineer, testified that prior to 1974 the wells in the Cherry Creek alluvium were not regulated and that there had been no legal means available to limit well pumping.

The water court entered its written findings of fact, conclusions of law, and decree on March 21, 1986. Noting that the 1969 decree was "somewhat ambiguous" as to the amount of water authorized to be diverted, the water court focused on paragraph 2B, the decretal portion of the 1969 judgment changing the points of diversion, which stated as follows:

> The Petitioner [Diamond Over D Ranch, Inc.], its successors and assigns as owners of the modified water rights may, in the exercise of any one or combination of two or more of said rights, divert water from the underflow of Cherry Creek at any single or a combination of two or more of the new, alternate points of diversion, provided that diversions under the priorities of said rights, shall not exceed the total amount of the Petitioner's interest in the Decrees as modified.

Since there was no indication in the 1969 proceeding of any "fractional interest" in any of the wells, the water court ruled that paragraph 2B of the 1969 decree was intended to authorize Diamond Over D Ranch, Inc. to divert an amount of water commensurate with its interest "under the surface decrees" as "limited to the historic use under the earlier surface decrees." The court concluded that "diversions will be measured by the historic use of the original decrees rather than what appears to be a somewhat expanded use of it that was taken under the wells," and, accordingly, affirmed the ruling of the referee which limited the applicants to 141 acre feet of water per year from the seven Diamond Over D Wells for municipal purposes.

The applicants then filed this appeal. They initially argue that the water court erred in interpreting the 1969 decree as limiting the amount of water that could be diverted at the new points of diversion to the amount historically used at the original decreed points of diversion. According to the applicants, the water court should have interpreted the 1969 decree as confirming the method and extent of irrigation practiced by the Dixons and the family corporation from 1956 to 1979, which resulted in the diversion through the wells and the consumptive use of 682 acre feet of water per year to irrigate 310 acres of land. The applicants next argue that the 1969 decree is res judicata on their right to withdraw 682 acre feet of water per year from the seven wells.

## II.

It has long been the rule in Colorado that if a decree is susceptible of more than one interpretation, one of which is consistent with applicable legal principles and the others of which are inconsistent with those principles, we obviously must choose that interpretation which accords with controlling legal norms. E.g., *Crawford Clipper Ditch Co. v. The Needle Rock Ditch Co.*, 50 Colo. 176, 182, 114 P. 655, 657 (1911); *Drach v. Isola*, 48 Colo. 134, 142, 109 P. 748, 751 (1910). Before we address the applicants' arguments, therefore, we first review those long standing principles of Colorado water law bearing upon a change in the point of diversion, since those principles will provide the legal context for determining whether the water court correctly interpreted the 1969 decree and also for resolving the res judicata claim raised by the applicants.

An owner of a water right may apply to the water court for a determination with respect to a change of the water right. § 37–92–302(1)(a), 15 C.R.S. (1987

Supp.). A change of a water right includes, as pertinent here, a change in the point of diversion. § 37–92–103(5), 15 C.R.S. (1973). Before the water court may grant an application for a change in the point of diversion, the applicant must demonstrate that the proposed change will not injuriously affect the vested rights of other water users. *Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 580, 272 P.2d 629, 632 (1954); *City of Colorado Springs v. Yust,* 126 Colo. 289, 294, 249 P.2d 151, 153 (1952); *see* § 37–92–305(3), 15 C.R.S. (1973).[4] Junior appropriators have a vested right to the continuation of stream conditions as they existed at the time of their appropriations, with the result that an application for a change in the point of diversion is always subject to the limitation that such change not injure the rights of junior appropriators. *City of Westminster v. Church,* 167 Colo. 1, 11–12, 445 P.2d 52, 58–59 (1968); *Farmers Highline Canal & Reservoir Co.,* 129 Colo. at 579–80, 272 P.2d at 631–32; *Enlarged Southside Irrigation Ditch Co. v. John's Flood Ditch Co.,* 116 Colo. 580, 586, 183 P.2d 552, 554–55 (1947).

■ In order to provide protection to the rights of other appropriators, especially to those junior in priority, several limita-

tions are read into every decree by implication. *E.g., Rominiecki v. McIntyre Livestock Corp.,* 633 P.2d 1064, 1067 (Colo. 1981); *Weibert v. Rothe Brothers, Inc.,* 200 Colo. 310, 316, 618 P.2d 1367, 1371–72 (1980); *Farmers Highline Canal & Reservoir Co.,* 129 Colo. at 580, 272 P.2d at 632. One such limitation is that "diversions are limited to an amount sufficient for the purpose for which the appropriation was made, even though such limitation may be less than the decreed rate of diversion." *Rominiecki,* 633 P.2d at 1067. An appropriator, therefore, "has no right as against a junior appropriator to divert more water than can be used beneficially, or to extend the time of diversion to irrigate lands other than those for which the appropriation was made." *Id.* (citations omitted). Nor may a senior appropriator, as against a junior appropriator, lend, rent, or sell any excess water after completing the irrigation of the land for which the water was appropriated. *Enlarged Southside Irrigation Ditch Co.,* 116 Colo. at 586, 183 P.2d at 554.

■ Similarly, the right to change a point of diversion is limited in quantity by historical use at the original decreed point of diversion. *Weibert,* 200 Colo. at 317, 618 P.2d at 1371–72.[5] " 'Historical use' as a limitation on the right to change a point

---

**4.** Section 37–92–305(3), 15 C.R.S. (1973), sets forth the standard by which an application seeking a change in point of diversion must be evaluated:

> A change of water right or plan for augmentation, including water exchange project, shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right. If it is determined that the proposed change or plan as presented in the application would cause such injurious effect, the referee or the water judge, as the case may be, shall afford the applicant or any person opposed to the application an opportunity to propose terms or conditions which would prevent such injurious effect.

This section is substantially the same as section 148–9–25(2), 7 C.R.S. (1963), of the 1943 Act, which governed the 1969 proceeding. That section stated:

> If it shall appear that such change will not injuriously affect the vested rights of others, the change shall be permitted by the decree to

be given by court. If, however, it appears that such change will injuriously affect the vested rights of others, the court shall deny the application unless the court is satisfied that by the imposition of terms and conditions such injurious effect may be prevented, in which case the court shall decree the change upon such terms and conditions.

**5.** The right to change a point of diversion is also limited in quantity to the duty of water with respect to the original decreed place of use. *Weibert v. Rothe Brothers, Inc.,* 200 Colo. 310, 316–17, 618 P.2d 1367, 1371 (1980). The duty of water was defined in *Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 584–85, 272 P.2d 629, 634 (1954), as follows:

> It is that measure of water, which, by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereon. It is not a hard and fast unit of measurement, but is variable according to conditions.

of diversion has been considered to be an application of the principle that junior appropriators have vested rights in the continuation of stream conditions as they existed at the time of their respective appropriations." *Id.* at 317, 618 P.2d at 1372. Thus, a senior appropriator is not entitled to enlarge the historical use of a water right by changing the point of diversion and then diverting from the new location the full amount of water decreed to the original point of diversion, even though the historical use at the original point of diversion might have been less than the decreed rate of diversion. *See Rominiecki*, 633 P.2d at 1067–68; *Weibert*, 200 Colo. at 317, 618 P.2d at 1371–72; *Shawcroft v. The Terrace Irrigation Co.*, 138 Colo. 343, 347, 333 P.2d 1043, 1046 (1958). As this court succinctly stated in *The New Cache LaPoudre Irrigating Co. v. The Water Supply and Storage Co.*, 49 Colo. 1, 7, 111 P. 610, 612 (1910):

> [A]n order permitting a change in the point of diversion to be made does not, and cannot, in any way enlarge the right of its recipient by conferring upon him power to divert a greater quantity of water from the stream than he theretofore took, or to use it for a greater length of time than he was previously entitled to.

### III.

■ We turn now to the applicants' claim that the water court erred in not interpreting the 1969 decree as confirming the method and extent of irrigation practiced by the Dixons and the family corporation which resulted in a consumptive use of 682 acre feet of water per year. Contrary to the applicants' claim, we are satisfied that long standing principles of Colorado

water law relating to a change in the point of diversion fully support the water court's ruling in this case.

The 1969 decree changing the points of diversion limited the amount of water that could be diverted through the seven wells, the new points of diversion, to that same amount historically diverted through the four ditches, the original decreed points of diversion. *E.g., Rominiecki*, 633 P.2d at 1067; *Weibert*, 200 Colo. at 316–17, 618 P.2d at 1371–72; *The New Cache LaPoudre Irrigating Co.*, 49 Colo. at 7, 111 P. at 612. The fact that the 1969 decree did not expressly limit the well diversions to the amount of water historically diverted through the ditches is not controlling, since such a limitation is read into every water decree by implication. *E.g., Rominiecki*, 633 P.2d at 1067; *Weibert*, 200 Colo. at 317, 618 P.2d at 1372; *Farmers Highline Canal & Reservoir Co.*, 129 Colo. at 580, 272 P.2d at 632.

The applicants nonetheless argue that the express finding in the 1969 decree that the changes in the points of diversion "will result in no change in the place or type of use of water" constituted approval of the Dixons' and the family corporation's method and extent of irrigation through the wells, which involved a consumptive use of 682 acre feet of water per year, especially since no evidence was introduced in the 1969 proceeding concerning the historic use of the water at the four ditches. We reject this argument for two reasons.

First, while it is true that the record of the 1969 proceeding is silent on the historical use of water at the four ditches, we point out that the same record is also silent on the amount of water diverted through the seven wells.[6] Indeed, the only evidence submitted at the 1969 proceeding remotely

---

The historical use of a water right could very well be less than the duty of water if, for example, it was physically impossible in the past to divert water at the optimum rate on a continuing basis. *Weibert*, 200 Colo. at 317, 618 P.2d at 1372. In such a case, diversions at the new point of diversion would necessarily be limited in quantity to the historical use at the original point of diversion.

6. We note that it is proper to consider the record of the 1969 proceeding when interpreting the decree. "We have consistently held that statements of claim and transcripts of testimony in adjudication proceedings are admissible evidence in other actions involving the construction or interpretation of water decrees." *Orchard City Irrigation Dist. v. Whitten*, 146 Colo.

related to the amount of use was testimony to the effect that the water rights in question had been used to irrigate portions of the land which eventually comprised the Diamond Over D Ranch. There simply is no factual basis in the 1969 record to support the applicants' claim that the 1969 decree somehow constituted approval of their expanded consumptive use of 682 acre feet of water per year at the new points of diversion.

Second, the 1969 decree, while it granted the petition to change the points of diversion, expressly provided that diversions "under the priorities of [the original decreed ditch rights] shall not exceed the total amount of [Diamond Over D Ranch's] interest in the Decrees as modified." To conclude that the 1969 decree confirmed the Dixons' and the family corporation's method and extent of irrigation would violate the basic principle of Colorado water law that the right to change a point of diversion is limited in quantity to the amount of water decreed to the original point of diversion and also by the amount of water historically used at the original decreed point of diversion. *E.g., Rominiecki*, 633 P.2d at 1067–68; *Weibert*, 200 Colo. at 317, 618 P.2d at 1371–72; *Shawcroft*, 138 Colo. at 345–50, 333 P.2d at 1044–47. The water court's interpretation of the 1969 decree, therefore, as limiting the applicants to 141 acre feet per year for municipal purposes, the amount of historical use at the original decreed points of diversion, was in all respects consistent with established principles of Colorado water law.

## IV.

■ We turn finally to the applicants' claim of res judicata. The applicants argue that the doctrine of res judicata prevents any inquiry into the historical use of the water rights originally decreed to the four ditches. We find this argument devoid of merit.

127, 135, 361 P.2d 130, 134 (1961); *see also City of Colorado Springs v. Yust*, 126 Colo. 289, 249

The applicants' argument is based on the erroneous assumption that the 1969 decree confirmed the Dixons' and the family corporation's consumptive use of 682 acre feet of water pumped through well diversion from 1956 to 1979. As previously discussed, the 1969 decree impliedly limited diversions through the wells to the amount which had been originally decreed to the four ditches, as further limited by the historical use at the original decreed points of diversion, and the water court's ruling in this case was a proper construction of that decree in light of controlling principles of Colorado law.

Furthermore, the applicants' argument proceeds from the false premise that the doctrine of res judicata prohibits an inquiry into the historical use of the water rights originally decreed to the four ditches. The doctrine of res judicata, which renders an existing judgment conclusive of the rights of the parties in any subsequent action on the same claim, *e.g., Pomeroy v. Waitkus*, 183 Colo. 344, 349–50, 517 P.2d 396, 399 (1974), is applicable only when there exists "identity of subject matter, cause of action, parties to the action, and capacity in the persons for which or against whom the claim is made." *Weibert*, 200 Colo. at 318, 618 P.2d at 1372. The instant case, in our view, is analytically identical to *City of Westminster v. Church*, 167 Colo. 1, 445 P.2d 52 (1968). In *Church*, the water rights at issue had originally been decreed to certain ditches, but in 1958 the City of Westminster's predecessor in interest obtained a decree changing the points of diversion. No evidence was presented during the 1958 proceeding concerning the historical use of the water rights decreed to the original points of diversion. The City of Westminster thereafter enlarged the use of its decreed water rights, and junior appropriators sought to enjoin Westminster from extending its use beyond the historical use at the original decreed points of diversion. The district court entered a par-

P.2d 151 (1952).

tial summary judgment in favor of the junior appropriators, declaring that the City of Westminster's use of its water rights was limited to the amount of water decreed to and historically used at the original points of diversion. On appeal, Westminster argued that the 1958 decree changing the points of diversion was res judicata on the junior appropriator's claim of enlarged or extended use. This court rejected Westminster's claim of res judicata, stating that "[w]here an owner of decreed rights, after obtaining a decree permitting a change in point of diversion, enlarges or attempts to enlarge the use of his water rights to the injury of other appropriators, the permissive decree does not bar relief to the latter." 167 Colo. at 9, 445 P.2d at 55; *see also Weibert*, 200 Colo. at 317–18, 618 P.2d at 1372. We also concluded that, since no evidence had been presented during the 1958 proceeding with respect to historical use at the original points of diversion, it was proper for the district court to determine the actual extent of historical use in the junior appropriators' suit against the city. 167 Colo. at 10, 445 P.2d at 56.

Our decision in *City of Westminster v. Church* thus refutes the applicants' claim that the water court was prohibited from considering evidence pertaining to the historical use of the water rights at the original decreed points of diversion. In the 1969 proceeding, Diamond Over D Ranch, Inc. applied for a change in the points of diversion from the four ditches to the seven wells and made no claim of enlarged or extended use beyond the historical use at the original decreed points of diversion. The 1969 proceeding was thus limited to whether the changes in the points of diversion from the ditches to the wells would injuriously affect the vested rights of other water users, with the result that the 1969 decree changing the points of diversion was subject to the limitation that the quantity of water to be used at the new points of diversion would not exceed the amount of water decreed to and historically used at the original decreed points of diversion. The doctrine of res judicata, therefore, did not bar the water court in the instant case from considering and determining the actual extent of historical use at the original decreed points of diversion in order to properly determine the nature and extent of the applicants' water rights under the 1969 decree.

The judgment is accordingly affirmed.