Concerning the APPLICATION FOR WATER RIGHTS IN RIO GRANDE COUNTY.

The State Engineer and The Division Engineer for Water Division 3, Opposers–Appellants.

v.

David W. Bradley, Applicant–Appellee.

No. 01SA295.

Supreme Court of Colorado, En Banc.

Sept. 9, 2002.

Ken Salazar, Attorney General, Alexandra L. Davis, Assistant Attorney General, Denver, Colorado, Attorneys for Opposers Appellants.

David W. Bradley, Pro Se, Monte Vista, Colorado.

Justice COATS delivered the Opinion of the Court.

The State Engineer and Division Engineer for Water Division No. 3 appealed a judgment of the water court approving an application by Bradley for a change of water right and ordering the issuance of a well permit. Bradley sought to change the point of diversion of an existing water right from a well in a corner of his property to a well in the center of his property. Because the evidence in the record does not support the water court's conclusion that granting the application will neither enlarge the existing right by expanding Bradley's historic use nor result in injury to other vested rights, the judgment of the water court is reversed.

## I. FACTS AND PROCEDURAL BACKGROUND

This dispute arises from an attempt by David W. Bradley to improve his method of irrigating 150 acres of farmland he owns in the San Luis Valley. In 1999, Bradley applied for a permit to construct a new well, to be used as an alternate point of diversion for an existing water right. The State Engineer denied the application on the grounds that he was unable to determine that unappropriated water was available for withdrawal by the proposed well and that the vested water rights of other appropriators would not be materially injured. Bradley then filed a pro se application with the water court for Water Division No. 3 for a determination with respect to a change of water right, specifically a change in point of diversion. The water referee denied that application, indicating simply that Bradley had failed to meet his burden of proof regarding historic use. Bradley then filed this protest with the water court, and the State and Division Engineers intervened.[1]

At the one-day hearing, the only testimony came from a hydrographic expert with the Division Engineer's Office and the applicant's brother, who was qualified as an expert in civil engineering. The hydrographic expert's testimony focused on the effect of the proposed change on the overappropriated Closed Basin and Rio Grande systems of the San Luis Valley.[2] He testified that because of Bradley's location above the moving hydraulic divide separating the two systems, at any given time withdrawals from the proposed well might not affect the same system as a withdrawal from the original location. Bradley's brother prepared and presented a "historical use report" and testified about his conclusion that no more water would be consumed on the land than under current methodology. Neither side presented any quantifiable evidence of well usage, and although anecdotal evidence of the use of the acreage in question was gathered and presented by the applicant's brother, showing varying degrees of crop production in different years, it was undisputed that annual irrigation of the acreage in question was never accomplished solely by well water.

Bradley's groundwater right was decreed by the water court in 1974 for irrigation purposes at a flow rate of 1,200 gallons per minute, 5.34 acre-feet per day, with an appropriation date of August 31, 1938; however, the evidence indicated that in addition to groundwater, Bradley had always irrigated his land with water from two surface rights,[3] which had been used on the land since before the construction of the corner well. It was undisputed, and found as a matter of fact by the water court, that in any given year the underground water would typically be ap-

---

1. Section 37–92–302(1)(b), 10 C.R.S. (2001), allows the State Engineer to oppose applications for determinations of a water right or changes to a water right.

2. A general description of the geographic, geologic, and hydrologic features of the San Luis Valley is set forth in *Alamosa–LaJara Water Users Protection Ass'n v. Gould*, 674 P.2d 914, 916–20 (Colo.1983). A description of the features of the Closed Basin appears in *Closed Basin Landowners Ass'n v. Rio Grande Water Cons.Dist.*, 734 P.2d 627, 629 (Colo.1987). *See also In re Rules*

*& Regulations Governing Use, Control, & Protection of Water Rights*, 674 P.2d 914, 918, 931 (Colo.1983) (stating that by 1900, all streams in San Luis Valley were overappropriated and that "underground water diversions from [valley aquifers] have been found to significantly affect stream flow").

3. The surface water was represented by 20 shares of the Rio Grande Canal and 20 shares of the Santa Maria Reservoir Company.

plied later in the growing season when Bradley's surface rights were used in full or curtailed by senior users.

Beginning in 1997 or 1998, Bradley largely abandoned his long-established practice of flood-irrigating through ditches and began delivering both his surface and underground water to two newly purchased center-pivot sprinklers by placing the water into a ditch, transporting it to a holding pond near the sprinklers, and pumping it into the sprinklers as needed. It was therefore clear that the acreage in question had always been irrigated by some combination of surface and well water.

The water court was clearly cognizant of the importance of differentiating the amount of surface water from the amount of well water historically used to irrigate the acreage in question, but it was also concerned about the difficulty and expense of quantifying the historic use of the particular water right for which a change in the point of diversion was requested. Noting that one of the goals of the Water Rights and Determination Act of 1969[4] was to simplify application and change procedures, the court ultimately concluded that the applicant had met his burden of proving the historic use of the water right to be changed and the feasibility of changing the point of diversion without injuring other vested users. The court then ordered the State Engineer to issue the requested well permit and to fashion any reasonable terms and conditions necessary to prevent any possible injury to other vested rights.[5]

The State and Division Engineers appealed the water court's ruling directly to this court.[6]

## II. APPLICATIONS TO CHANGE THE POINT OF DIVERSION

■ Although a water right in Colorado is usufructuary in nature, with ownership of the water itself remaining in the public, it is nevertheless a property right. *Santa Fe Trail Ranches v. Simpson*, 990 P.2d 46, 54 (Colo.1999); *Shirola v. Turkey Canon Ranch, L.L.C.*, 937 P.2d 739, 748 (Colo.1997); *Weibert v. Rothe Brothers, Inc.*, 200 Colo. 310, 315, 618 P.2d 1367, 1371 (1980). Water rights are created when a person appropriates unappropriated water by putting it to a beneficial use. *Williams v. Midway Ranches Property Owners Ass'n, Inc.*, 938 P.2d 515, 521 (Colo.1997); *Shirola*, 937 P.2d at 748. A water right adjudication is therefore a judicial proceeding at which respective priorities of water rights are ascertained. *Shirola*, 937 P.2d at 748. An absolute decree confirms that an appropriation has vested as a property right and entitles the subsequent operation of that right through its decreed point of diversion, in a specified amount, for a particular beneficial use. *Midway Ranches*, 938 P.2d at 521.

■ One of the incidents of a water right is the right to change the point of diversion.[7] *Weibert*, 200 Colo. at 316, 618 P.2d at 1371; *see also Farmers Res. & Irr. Co. v. City of Golden*, 44 P.3d 241, 245 (Colo.2002) (same with regard to change of use). Under the 1969 Act, an application for a change of water right must be approved if the change will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right, § 37–92–305(3); *Farmers Res. & Irr. Co.*, 44 P.3d at 246, and conversely, a change cannot be granted if it will injuriously affect the rights of other users. *Farmers Res. &*

---

4. *See* title 37, art. 92, 10 C.R.S. (2001).

5. The Act permits approval of an application for a change of water right only if such a change will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right, and in cases in which a statement of opposition has been filed, it prescribes a formula for the parties to propose to the referee or water court a ruling or decree with terms and conditions that will prevent any such injurious effect. *See* § 37–92–305(3), 10 C.R.S. (2001).

6. The court of appeals lacks jurisdiction over "water cases involving priorities and adjudications." *See* § 13–4–102(d), 5 C.R.S. (2001).

7. A "change in water right" includes "a change in the type, place, or time of use, a change in the point of diversion, a change from a fixed point of diversion to alternate or supplemental points of diversion, [or] a change in the means of diversion,...." § 37–92–103(5).

*Irr. Co.*, 44 P.3d at 246; *City of Thornton v. Bijou Irr. Co.*, 926 P.2d 1, 80 (Colo.1996). "A classic form of injury involves diminution of the available water supply that a water rights holder would otherwise enjoy at the time and place and in the amount of demand for beneficial use under the holder's decreed water right operating in priority." *Farmers Res. & Irr. Co.*, 44 P.3d at 246 (quoting *Farmers Res. & Irr. Co. v. Consol. Mut. Water Co.*, 33 P.3d 799, 807 (Colo.2001)). In any event, however, it is inherent in the notion of a "change" of water right that the property right itself can only be changed and not enlarged. *Id.* at 246. The appropriator of native water may not enlarge an appropriation without establishing all of the elements of an independent appropriation, which will necessarily have a later priority date. *Santa Fe Trail Ranches*, 990 P.2d at 54.

■ Although a decree does not confer, but rather confirms a pre-existing water right (or in the case of conditional applications, gives the applicant the opportunity to develop the right and obtain a priority date that relates back to the date of the first step), *Shirola*, 937 P.2d at 748, several limitations on the right to divert at the full decreed rate at all times are read into every decree by implication. *Orr v. Arapahoe Water & Sanitation Dist.*, 753 P.2d 1217, 1223 (Colo. 1988); *Rominiecki v. McIntyre Livestock Corp.*, 633 P.2d 1064, 1067 (Colo.1981); *Weibert*, 200 Colo. at 316, 618 P.2d at 1371. Diversions are implicitly limited to an amount sufficient for the purpose for which the appropriation was made, without waste or excessive use. *Weibert*, 200 Colo. at 318,

618 P.2d at 1372; *Hoehne Ditch Co. v. Martinez*, 71 Colo. 428, 431, 207 P. 859, 860 (1922); *Baca Ditch Co. v. Coulson*, 70 Colo. 192, 195, 198 P. 272, 273 (1921). A diversion of water decreed for irrigation purposes is limited by the "duty of water"[8] with respect to the decreed place of use. *In re Steffens*, 756 P.2d 1002, 1005 (Colo.1988). In addition, diversions are implicitly limited in quantity by historic use at the original decreed point of diversion. *Orr*, 753 P.2d at 1223. The actual historic diversion for beneficial use could be less than the optimum utilization represented by the duty of water in any particular case, either because the well or other facility involved cannot physically produce at the decreed rate on a continuing basis, *e.g., Weibert*, 200 Colo. at 317, 618 P.2d at 1372, or because that amount has simply not been historically needed or applied for the decreed purpose, *e.g., Hoehne Ditch Co.*, 71 Colo. at 430–31, 207 P. at 860.

■ In the past, we have explained this limitation by noting that "over an extended period of time a pattern of historic diversions and use under the decreed right at its place of use will mature and become the measure of the water right for change purposes." *Midway Ranches*, 938 P.2d at 521. The right to change a point of diversion is therefore limited in quantity by the historic use at the original point of diversion.[9] *Orr*, 753 P.2d at 1223; *Weibert*, 200 Colo. at 317, 618 P.2d at 1371–72. "Thus, a senior appropriator cannot enlarge the historical use of a water right by changing the point of diversion and then diverting from the new location the full amount of water decreed to the origi-

---

8. The duty of water has been defined as:
   [T]he measure of water, which, by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereof. It is not a hard and fast measurement, but is variable according to conditions. *See In re Steffens*, 756 P.2d at 1005 (Colo.1988)(quoting *Farmers Highline Canal & Res. Co. v. City of Golden*, 129 Colo. 575, 584–85, 272 P.2d 629, 634 (Colo.1954)).

9. The term "historic use" refers to the "historic consumptive use," *see, e.g., Farmers Res. & Irr. Co. v. City of Golden*, 44 P.3d 241, 247 (Colo. 2002), or "historic beneficial consumptive use,"

*see, e.g., Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1147 (Colo.2001), attributable to the appropriation the quantity of water historically consumed by application to the beneficial use for which it was decreed. Although we have often used the term in describing the quantity of water historically diverted, the amount of water diverted and applied to any beneficial use that entails less than 100% consumption will necessarily be greater than the historic consumptive use. In light of the further implied limitation on diversions to an amount sufficient for the purpose for which the appropriation was made, without waste or excessive use, the allowable historic diversion is clearly determined by historic consumptive use.

nal point of diversion, even though the historical use at the original point of diversion might have been less than the decreed rate of diversion." *Orr* 753 P.2d at 1223; *see also Farmers Res. & Irr. Co.*, 44 P.3d at 248 (citing *Empire Lodge Homeowners' Ass'n*, 39 P.3d at 1156, for the proposition that the enlargement doctrine prohibits an appropriator from expanding its historic appropriation).

■ An absolute decree, whether expressed in terms of a flow rate or a volumetric measurement, is itself not an adjudication of actual historic use but implicitly is further limited to actual historic use. In order to determine that a requested change of a water right is merely that, and will not amount to an enlargement of the original appropriation, actual historic use must therefore, in some fashion and to some degree of precision, be quantified. As we have previously observed, once an appropriator exercises the right to change a decreed water right, he runs the real risk of requantification of the right based upon actual historic consumptive use at an amount less than his original decree. *Midway Ranches*, 938 P.2d at 522; *Pueblo West Metro. Dist. v. Southeastern Colo. Water Conservancy Dist.*, 717 P.2d 955, 959 (Colo.1986).

The acreage under irrigation is a common basis of measuring the use of water in the adjudication of priorities, *Farmers Res. & Irr. Co.*, 44 P.3d at 247, but if the same acreage is also being irrigated by water from appropriations other than the one for which a change is sought, some measure of the applicable appropriation's historic contribution to the duty of water is necessary to determine its historic use and ensure that the appropriation will not be enlarged by the change. Whether this is accomplished by directly gauging the quantity of water applied to the decreed beneficial use from the right to be changed or by deducing it from the contributions of other appropriations and the overall duty of water, it is impossible to know that a change will not exceed the historic use of any particular appropriation without some way of differentiating the contributions of the various rights involved. In such cases, calculation of the productivity and needs of the acreage alone can never be sufficient.

■ It is well-established that the applicant for a change of water right bears the burden of proving by a preponderance of the evidence that the requested change will not injure other users. *Farmers Res. & Irr. Co.*, 44 P.3d at 246. Although less expressly articulated, an obligation to demonstrate that the requested change remains within the scope of the original right and does not require a new and independent appropriation is necessarily included within this burden. While the enlargement of a water right, as measured by historic use, may be injurious to other rights, it also simply does not constitute a permissible "change" of an existing right. The applicant therefore bears the risk of nonpersuasion with regard to historic use as well as the absence of injury to other rights. Both are primarily matters for the trier of fact, but if the record fails to contain evidence from which both can be favorably resolved, the application must be denied. *See* § 37–92–305(3); *Santa Fe Trail Ranches*, 990 P.2d at 58 (citing *Rominiecki*, 633 P.2d at 1067–68 and *Weibert*, 200 Colo. at 316, 618 P.2d at 1371).

### III. VALIDITY OF THE WATER COURT'S ORDER

■ In its order, the water court made a number of factual findings from the evidence but failed to suggest how any of those findings led to its conclusion that the applicant had met his burden with regard to historic use and lack of injury. Not only do the court's factual findings and the undisputed evidence from the applicant's own expert fail to support the conclusions reached by the court; they demonstrate with near certainty that the requested change would amount to an enlargement of the applicant's original water right and would be injurious to other vested rights.

Bradley's property has been served by at least three distinct water sources for over sixty years. The record contained no suggestion that the well had ever been the sole source of water for the acreage in question, even during the two years since the implementation of the center-pivot sprinklers.

Though he made no attempt to quantify the contribution of his surface water rights to the overall duty of water on the irrigated acreage, the record indicated that the ground water appropriation, for which the change was sought, was used only in a supplemental capacity, being applied each year only later in the growing season, after the available surface water ran out. Because Bradley's application requested enough water from the new point of diversion to irrigate, by itself, 128 acres of the same 150 acre-field, his burden required, at the least, a demonstration that historic diversions from the corner well amounted to approximately eighty-five percent of the water historically applied to the entire field. The record failed to support, and was almost certainly inconsistent with, such a determination.

The inadequacy of the applicant's presentation was not due merely to a lack of precision or accuracy in quantifying historic use. It resulted from a conceptual failure to distinguish actual historic use from the face amount of the decree, and therefore a failure to even attempt to establish the historic use of the well-water, separate and apart from historic use of the applicant's surface water. In approving the request, the water court appears to have conflated the historic use of the land as a whole with the historic use of the groundwater. Admirable as the applicant's attempt to improve the efficiency of his irrigation technique may have been, a water right is a property right, which can be sold or further changed once it is established. An enlargement of the applicant's right would at the very least have the effect of advancing his priority to any additional water over that of junior appropriators, and in the overappropriated systems of the San Luis Valley it would necessarily be injurious to other vested rights.

## IV. CONCLUSION

Because the record does not support the water court's conclusion that the applicant met his burden of proof with regard to the historic use of the water right for which he sought a change or the lack of injury to other vested rights, the water court's order must be reversed. The case is remanded for fur-

ther proceedings consistent with this opinion, including the possible presentation of additional evidence or modification of the application.