CONCERNING the APPLICATION FOR WATER RIGHTS OF MIDWAY RANCHES PROPERTY OWNERS' ASSOCIATION, INC. IN EL PASO AND PUEBLO COUNTIES.

Ralph R. WILLIAMS, Trustee of the Greenview Trust, Appellant,

v.

MIDWAY RANCHES PROPERTY OWNERS ASSOCIATION, INC., Fountain Mutual Irrigation Company, Hal D. Simpson, State Engineer of Colorado, and Steven J. Witte, Division Engineer, Water Division No. 2, Appellees.

No. 96SA369.

Supreme Court of Colorado, En Banc.

June 2, 1997.

MacDougall Law Office, M.E. MacDougall, Julianne M. Woldridge, Henry D. Worley, David I. Liberman, Colorado Springs, for Appellant.

Felt, Houghton & Monson, LLC, Steven T. Monson, Colorado Springs, for Fountain Mutual Irrigation Company.

The Pratt Law Firm, Kevin B. Pratt, Parker, for Midway Ranches Property Owners Association, Inc.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Attorney General, Richard A. Westfall, Solicitor General, Joseph C. Smith, Jr., Deputy Attorney General, Lee E. Miller, First Assistant Attorney General, Steven O. Sims, Assistant Attorney General, Natural Resources Section, for the State and Division Engineers.

Vranesh & Raisch, LLC, Michael D. Shimmin, Boulder, for Amici Curiae the City of Fort Collins and Bijou Irrigation Company.

Loyal E. Leavenworth, Glenwood Springs, for Amicus Curiae the City of Rifle.

Porzak Browning & Johnson LLP, Glenn E. Porzak, Steven J. Bushong, Boulder, for Amicus Curiae the City of Golden.

Chrisman, Bynum & Johnson, P.C., David G. Hill, Jack M. Graves, Boulder, for Amicus Curiae the City of Englewood.

John M. Dingess, Denver, for Amicus Curiae the City of Aurora, Acting By and Through its Utility Enterprise.

Justice HOBBS delivered the Opinion of the Court.

This appeal from a judgment and decree of the Water Court for Water Division No. 2 concerns an augmentation plan filed by Midway Ranches Property Owners' Association, Inc. (Midway Ranches), proposing to utilize shares of the Fountain Valley Mutual Irrigation Company (FMIC) to replace depletions from out-of-priority diversion and use of water by a tributary well in connection with a central water supply system for a new subdivision development between Colorado Springs and Pueblo.[1] In previous determinations the water court had found that each FMIC share yielded 0.7 acre-foot of net average consumptive use for replacement purposes per year based on historic use of the mutual ditch company's water rights. Objector/Appellant, The Greenview Trust, through its trustee Ralph R. Williams (Greenview Trust) asserts that the water court, prior to trial, erroneously employed *res judicata* to bar redetermination of the previous quantification of the FMIC water rights.

We affirm the judgment of the trial court in part but also reverse in part. We remand the case for revision of the decree to: (1) include an identification of the FMIC water rights, by decree number, amount, appropriation and adjudication dates, which Midway Ranches owns *pro rata* as a shareholder for use in the augmentation plan; and (2) limit FMIC to 5,800 shares, absent further court review, so that the historic yield of 0.7 acre-foot per share is not diluted.

## I.

By application, resume, and publication of legal notice in newspapers of general circulation in the Arkansas River Valley, Midway Ranches proposed an augmentation plan to permit out-of-priority diversion and use in connection with a well to serve a central water supply system for a new development, identified as Midway Ranches POA Well No. 1. The well would tap an underground water tributary to Fountain Creek and the Arkansas River in the Widefield Aquifer. The State Engineer denied the well permit in the absence of an approved augmentation plan, *see* § 37–90–137(2), 15 C.R.S. (1996 Supp.); § 37–92–305(6), 15 C.R.S. (1996 Supp.), and this case was initiated.

The resume and newspaper legal notices identified the FMIC water rights proposed to be utilized in the plan for augmentation and referenced prior water court determinations whereby FMIC water rights were quantified for use in augmentation plans, including the judgment and decree in Case No. 90CW28, for the Security Water and Sanitation District (Security). The Security case judgment and decree contained a finding that "each Fountain Mutual share has historically yielded on the average the equivalent of 0.7 acre-feet of net replacement or consumptive use water per year."

On March 21, 1995, Greenview Trust filed its Statement of Opposition and a Motion to Re–Refer the case from the referee to the water judge. Greenview Trust holds irrigation rights to tributary waters, with priorities dating to the early 1860s diverting downstream of FMIC and the proposed development on Fountain Creek above its junction with the Arkansas River at the north edge of Pueblo. Greenview Trust: (1) alleged that an error in administration by water officials, consisting of imposition of a futile call for a number of years, had resulted in greater diversions into the FMIC system than other-

---

1. Appellant framed the following issues for appeal:

(1) The Water Judge must limit FMIC water rights to the historic consumptive use at the original decreed points of diversion;

(2) The Water Judge must impose a term or condition to limit each share to a proportion of the historic consumptive use not to [exceed] 1/6000 per share, or 0.7 acre feet;

(3) The Water Judge must find and determine whether any of the water rights claimed by FMIC are abandoned, particularly those beyond 90 c.f.s. and 5,000 acre feet;

(4) The Water Judge must find and determine that Priority No. 17, Laughlin Ditch, does not have a decree allowing it to be diverted at the Fountain Mutual headgate and order that such diversions cease until a proper decree changing the point of diversion is entered;

(5) The Water Judge must follow *Steffens* and identify and quantify the decreed acreage that can be irrigated; [and]

(6) The Water Judge must describe the water rights being changed by the Decree by name, amount, appropriation date and adjudication date.

wise would have occurred; (2) requested imposition of a dry-up covenant on lands under the FMIC system; and (3) reserved the right to assert other grounds at a later time in the proceeding. A Statement of Opposition by the State and Division Engineers requested conditions that would adequately address the time, place, and amount of replacement water released to offset well depletions in order to protect vested water rights and allow the out-of-priority diversion to occur without curtailment by the water officials. The City of Colorado Springs and FMIC also filed Statements of Opposition.

Trial was set for December 27 and 28, 1995. Greenview Trust filed pre-trial briefs alleging that it was not bound by prior court determinations regarding historical usage of the FMIC water rights, due to failure of the court to apply the correct case law previously. Greenview Trust alleged that the historic use quantification of FMIC's water rights should have been based on irrigation of lands under the originally decreed points of diversion prior to transfer of certain water rights to the FMIC system. FMIC responded with a motion *in limine* seeking to preclude redetermination of prior historical usage determinations of the FMIC water rights entered by the water court in previous augmentation cases. In particular, FMIC relied upon the judgment and decree entered on July 6, 1992, in Case No. 90CW28 (Security decree), regarding an augmentation plan for Security, which is included in the record before us.

The Security decree identified FMIC water rights changed for augmentation use by description, including priority numbers and dates, and the decree contained findings of fact that the historical yield of each FMIC share is 0.7 acre-foot of water. That decree also included a finding that FMIC is a water-short and urbanizing system with appropriate dry-up occurring without the need of a dry-up covenant on lands historically under the system. Entry of the Security decree was preceded by resume notice and publication of legal notice in newspapers of general circulation in the Arkansas River Valley which stated, at the outset of that case, that an historical consumptive use credit of 0.7 acre-foot of water per share was being claimed for augmentation purposes utilizing FMIC water rights.

With leave of the court, Security and other holders of FMIC shares filed pre-trial briefs in the present case arguing against reopening the historic use determinations regarding the FMIC water rights. A brief of the State and Division Engineers argued that certain events had occurred since the last litigated determination of historical use and asserted that *res judicata* should not bar consideration of these events.

On December 20, 1995, the water court entered an order determining that the judgments and decrees in the prior water court cases were *res judicata* on the issues of historical consumptive use attributable to FMIC shares and dry-up requirements as of the entry of the Security decree in 1992. The court recited that it had reviewed the resume notice and the findings in the Security decree and ruled that Greenview Trust's attempt to quantify FMIC water rights in light of *Orr v. Arapahoe Water & Sanitation District,* 753 P.2d 1217 (Colo.1988), could have been brought in opposition to previous augmentation cases. The case management order of December 21, 1995, provided that Midway Ranches would offer proof supporting the prior 0.7 acre-foot historic yield determinations under current conditions of the FMIC system.

At trial, Midway Ranches' expert, Gary Thompson of W.W. Wheeler, explained that he had performed the water engineering analysis for the Security augmentation plan and the current Midway Ranches plan. The 0.7 acre-foot yield calculation for the Security decree was based on irrigation of 5,000 acres under the FMIC system for a representative historic period. During that time, FMIC had operated year round for summer irrigation and during the winter primarily in a reservoir storage mode, with some winter irrigation occurring. Approximately one-third of the company's stock, 1,899 shares, has now been changed to augmentation use through previous water court proceedings resulting in decrees employing the 0.7 acre-foot credit for each FMIC share. Less than 2,000 acres are currently being irrigated under the FMIC system. Thompson testified that dry-up of

the formerly irrigated lands has occurred by reason of increasing urbanization and will continue to occur as water is removed from the ditch system through augmentation structures, including the Spring Creek station which will be used for replacement releases to the stream under the plan before us. The augmentation water will first be diverted into the FMIC system under its priorities and released from a point down the ditch through the augmentation structure into Spring Creek and then to Fountain Creek to replace well depletions which impact the stream flow.

Thompson further stated that he had examined changes which arguably could have affected his prior 0.7 acre-foot per share quantification analysis for Security since his engineering analysis in that case. He testified that the 0.7 acre-foot yield per share, based on historic usage under FMIC, was still correct. Thompson reviewed accounting procedures and decree conditions which would ensure that the out-of-priority diversions to be made by Midway Ranches occurred only in connection with replacement water being supplied timely and in adequate amounts for downstream appropriations through the Spring Creek augmentation structure. Thompson added that he had not utilized the number four and number seventeen priorities, disputed by Greenview Trust, in his yield analysis in connection with either the Security or the Midway Ranches augmentation plans. He testified that his yield analysis took into account only priorities owned by FMIC and that the futile call of which Greenview Trust complained did not affect the accuracy of the yield analysis.

Richard Janitell, president of the FMIC Board of Directors, explained that the number four and number seventeen priorities were being carried in the ditch by agreement with the owners of those priorities and were not wholly owned by FMIC. After entry of the Security decree, 700 FMIC treasury shares were exchanged for part of the number four priority owned by third parties, so that this increase in FMIC shares was offset by additional water dedicated to the company, which now had an approximate total of 5,800 outstanding shares.

On the second day of trial, Midway Ranches stipulated to the entry of a number of decree conditions to address issues raised during Gary Thompson's testimony the day before. Midway Ranches committed: (1) to providing a continuous buffer of seven shares for additional replacement release above that calculated to be required in order "to assure depletions will not go unreplaced as well pumping increased due to growth"; and (2) to storage of Midway Ranches' excess augmentation credits in the FMIC Big Johnson Reservoir to be utilized for intraditch exchanges. These exchanges would provide augmentation water at the Spring Creek station in months when delivery of water *pro rata* under the Midway Ranches shares might be inadequate otherwise. Any lease of Midway Ranches shares not yet necessary for augmentation use would be accompanied by notification to the parties to this case, and the use of such leased shares would be subject to the State Engineer's review and approval. FMIC also stipulated to holding its number of shares at 5,800, in accordance with Gary Thompson's testimony that the 0.7 acre-foot historic yield calculation would still be applicable for that number of shares.

The water court's judgment and decree of August 22, 1996, contains a finding, based on evidence in this case, that the previous judgment and decree determinations of a 0.7 acre-foot water yield on the average per FMIC share "holds true today," taking into consideration "changed circumstances since 1991." The court found that the sixty-nine FMIC shares owned by Midway Ranches would serve to replace 48.3 acre-feet of out-of-priority depletions through its well and that a dry-up covenant would not be required because of urbanization of formerly irrigated lands and dry-up occurring as a result of removing the water from FMIC for augmentation purposes.

The decree requires the replacement water to be measured and discharged through the augmentation structure, pursuant to monthly measurements, calculations, and accounting acceptable to the state and division engineers, throughout the year. Diversions by the out-of-priority well must be measured, so that depletions through the well are offset by

adequate replacement supply. Offsetting replacement is to occur in the month after the corresponding well pumping to account for the lag time between the pumping and its impact on the river, based on the Glover analysis. The court retains jurisdiction on the question of injury to vested water rights for five years *after* the annual well pumping reaches twenty-three acre-feet per year, pursuant to section 37–92–304(6), 15 C.R.S. (1990), and the shares dedicated by Midway Ranches under the plan may not be used for purposes other than augmentation thereunder, absent court order.

The decree inadvertently omits to identify the FMIC water rights which are to be utilized for purposes of the approved augmentation plan and contains a 6,000 share limitation on the number of FMIC shares, rather than the 5,800 number which FMIC stipulated to at trial.

## II.

In the case before us, the nature and extent of historic usage under the FMIC water rights was quantified in prior case judgments and decrees finding that each share of FMIC stock is entitled to a 0.7 acre-foot yield credit when utilized for replacement water releases in an augmentation plan. These calculations were based on historic irrigation of 5,000 acres under the FMIC system. Greenview Trust alleges here that these calculations were erroneous under *Orr v. Arapahoe Water & Sanitation District*, 753 P.2d 1217 (Colo.1988), because the prior quantification was not made for lands irrigated under the originally decreed points of diversion prior to change of six of ten FMIC water rights to diversion and use under the FMIC system.[2]

We conclude that the water court was correct in applying *res judicata* to prevent relitigation of the historic use determinations made by previous water court judgments and decrees regarding the FMIC water rights. We also conclude that evidence in the record supports the water court's finding that the 0.7 acre-foot yield calculation continued to apply under arguably changed conditions occurring between entry of the Security decree and the trial of this case.

### A.

#### *Historic Usage Is The Measure Of A Matured Appropriation For Change And Augmentation Plan Purposes*

 Water rights in Colorado arise by appropriation and beneficial use of unappropriated water. *See Shirola v. Turkey Cañon Ranch Ltd. Liab. Co.*, 937 P.2d 739, 747–48 (Colo.1997). An absolute decree confirms that an appropriation has vested as a property right and entitles the subsequent operation of that right through its decreed point of diversion in a specified amount, usually expressed in rate of flow for a diversion right or in acre-feet of water for a storage right. Over an extended period of time, a pattern of historic diversions and use under the decreed right at its place of use will mature and become the measure of the water right for change purposes, typically quantified in acre-feet of water consumed.[3] *See Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 34 n. 3 (Colo.1997); *Weibert v. Rothe*, 200 Colo. 310, 316–17, 618 P.2d 1367, 1371 (1980). Quantification of the amount of water beneficially consumed in the placement of water to the appropriator's use guards against rewarding wasteful practices or recognizing water claims which are not justified by the nature and extent of the appropriation's need.

 Absolute water rights used in one location may be quantified and changed for use in an augmentation plan to provide replacement water releases, so that diversion

---

**2.** The transfer decrees were entered in Case No. 16386 on December 12, 1927, Case No. 31811 on December 6, 1954, Case No. 20211 on July 31, 1935, and an unnumbered case on July 30, 1906.

**3.** With regard to an irrigation right,
 [i]t is that measure of water, which, by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereon. It is not a hard and fast unit of measurement, but is variable according to conditions.
 *Farmers Highline Canal & Reservoir Co. v. City of Golden*, 129 Colo. 575, 584, 272 P.2d 629, 634 (1954).

and use of water may be made out-of-priority elsewhere.[4] Augmentation plans implement the Colorado doctrine of optimum use and priority administration, which favors management of Colorado's water resource to extend its benefit for multiple beneficial purposes. *See People ex rel. Simpson v. Highland Irrigation Co.*, 917 P.2d 1242, 1252 (Colo.1996). Out-of-priority diversions can occur only when a replacement supply of water, suitable in quantity and quality, is made available to substitute for the otherwise diminished amount of water available to supply other water rights exercising their priorities. *See* § 37–92–305(5), 15 C.R.S. (1990); *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 91 (Colo.1996). Depletions not adequately replaced shall result in curtailment of the out-of-priority diversions. *See* § 37–92–305(8), 15 C.R.S. (1996 Supp.).

Out-of-priority diversions through a well, as with all use through a well, require a well permit, *see* § 37–90–137(1), 15 C.R.S. (1990), and are properly adjudicated to alleviate injury to other water rights in connection with an augmentation plan application and proceeding which is accompanied by publication of resume notice, *see* § 37–92–305(8), 15 C.R.S. (1996 Supp.). The purpose of an adjudicated augmentation plan is to fix the conditions under which the state and division engineers may allow out-of-priority depletions of the waters of a natural stream to occur in the administration of decreed priorities. *See Shirola*, 937 P.2d at 752. An essential component of an augmentation plan is the provision for adequate replacement water. Replacement water may be provided from any water source legally available for use in an augmentation plan, including: (1) non-tributary water; (2) developed water which is foreign to the tributary system; and (3) tributary native water which has been quantified by historic beneficial use.

One of the basic tenets of Colorado water law is that junior appropriators are entitled to maintenance of stream conditions existing at the time of their respective appropriations. *See Bijou Irrigation Co.*, 926 P.2d at 80. Accordingly, the right to make a change to a tributary water right, such as a change in point of diversion or place or type of use, is limited in time and quantity to historic use.

We have previously examined the link among historic usage under a water right, available yield credits for an augmentation plan, and the application of *res judicata*. In *Weibert*, 200 Colo. at 318, 618 P.2d at 1372, we recognized that "the period and pattern of use are not known with certainty at the time a water right is adjudicated." Thus, the decreed flow rate at the decreed point of diversion is not the same as the matured measure of the water right. Into every decree awarding priorities is read the implied limitation that diversions are limited to those sufficient for the purposes for which the appropriation was made. *See id.* at 313–14, 618 P.2d at 1371.

Because water rights are usufructuary in nature, the measure of a water right is the amount of water historically withdrawn and consumed over time in the course of applying water to beneficial use under the tributary appropriation without diminishment of return flows. *See Danielson v. Kerbs Ag., Inc.*, 646 P.2d 363, 373 (Colo.1982) ("It is a fundamental principle that the consumptive use of water may not be increased to the injury of other appropriators."). When a determination of historic usage has not previously been made, the water right must be quantified to effectuate a change or augmentation-plan case. "[O]nce an appropriator exercises his or her privilege to change a water right the appropriator runs a real risk of a requantification of the water right based on actual historical consumptive use." *Pueblo West Metro. Dist. v. Southeastern Colo. Water Conservancy Dist.*, 717 P.2d 955, 959 (Colo.1986) (citation omitted).

Determining the historic usage of a tributary water right is not restricted to

4. Many absolute irrigation rights in Colorado are held by mutual ditch companies which were formed to furnish water for shareholders, *see Jacobucci v. District Court*, 189 Colo. 380, 386, 541 P.2d 667, 671 (1975), in contrast to carrier companies for profit or hire which are subject to county commission rate regulation, *see Bennett Bear Creek Farm Water Dist. v. City & County of Denver*, 928 P.2d 1254, 1264 (Colo.1996).

change and augmentation plan proceedings. Prior to *Weibert*, we enunciated that equitable relief is available, upon appropriate proof, to remedy expanded usage which injures other decreed appropriations. *See Enlarged Southside Irrigation Ditch Co. v. John's Flood Ditch Co.*, 116 Colo. 580, 588, 183 P.2d 552, 555 (1947). "[A]creage under irrigation is the principal basis of measurement of the use of water in the adjudication of priorities, and use on increased acreage of necessity is evidence, although rebuttable, of increased use either in volume or time." *Id.* at 587–88, 183 P.2d at 555. In *Southside*, we said that the ditch company's direct flow decree was *res judicata* "as to the date and amount of priorities there adjudicated to the ditch" (normally expressed in cubic feet per second of water), but that *res judicata* did not preclude determining the extent of historic use under the water right in ascertaining whether an injurious enlargement had been effectuated.[5] *Id.* at 586, 183 P.2d at 555.

▆▆▆▆ In contrast to developed or imported water which is foreign to the tributary supply and typically can be utilized to extinction, *see Bijou Irrigation Co.*, 926 P.2d at 66–68, an appropriation of tributary water cannot serve an enlarged duty, in the absence of noticed intent to appropriate for reuse or successive uses, *see Water Supply & Storage Co. v. Curtis*, 733 P.2d 680, 682, 683 (Colo. 1987) ("with respect to tributary waters, we have held that the owner of a water right may not reuse or make successive uses of the return flow independent of the priority system"); *see also Pulaski Irrigating Ditch Co. v. City of Trinidad*, 70 Colo. 565, 568, 203 P. 681, 682 (1922) (appropriator limited to actual needs and unused water must be returned to stream). It follows that a subsequent court proceeding involving an unquantified tributary water right may entail its quantification so that the vested appropriations of others which depend on return flows will not be invaded. A water right may be the subject of successive change proceedings because the right to make a change of the owners' choosing, subject to notice and conditions that avoid injury to other vested water rights, is a component of the bundle of sticks of a Colorado water right.[6] *See Weibert*, 200 Colo. at 315–16, 618 P.2d at 1371.

▆▆▆▆ All water rights are subject to beneficial use as the measure of the right, *see Rominiecki v. McIntyre Livestock Corp.*, 633 P.2d 1064, 1067 (Colo.1981). When prior change decrees are subject to interpretation in subsequent change proceedings, the ordinary interpretation to be made in the absence of a quantification or otherwise controlling terms of a prior judgment is that historic usage under the appropriation at its decreed point of diversion governs the extent of usage under the change decree. *See Orr*, 753 P.2d at 1222, 1223.

In *Orr*, surface irrigation rights, dating as early as the 1860s, were changed in a 1969 proceeding to an alternate point of diversion for irrigation by wells. In 1981, the changed water rights were the subject of a further proceeding to change the type and place of use for municipal purposes. Because historical usage of the original surface irrigation rights had not been determined previously, we interpreted the 1969 change decree as containing an implied limitation that usage thereunder was restricted to that amount which occurred historically under the irrigation rights at their originally decreed point of diversion. We reiterated the principle that an appropriation cannot be expanded to the injury of other appropriations:

> a senior appropriator is not entitled to enlarge the historical use of a water right by changing the point of diversion and then diverting from the new location the full amount of water decreed to the original point of diversion, even though the historical use at the original point of diversion might have been less than the decreed rate of diversion.

---

5. A final absolute decree is also *res judicata* on the issue of the necessary steps having been completed to effect an appropriation. *See Southeastern Colo. Water Conservancy Dist. v. Rich*, 625 P.2d 977, 979 (Colo.1981).

6. A ditch bylaw restriction against transfer of shares can effectively prevent removal of water from a mutual irrigation system. *See Fort Lyon Canal Co. v. Catlin Canal Co.*, 642 P.2d 501, 508–09 (Colo.1982). No such bylaw existed or was involved here.

*Orr*, 753 P.2d at 1224. We held in that case that *res judicata* did not bar reviewing the prior proceeding dealing with changes in point of diversion to ascertain whether historical usage had been determined in that proceeding. *See id.* at 1225.

As to our prior decision in *Westminster v. Church*, 167 Colo. 1, 445 P.2d 52 (1968), we observed in *Orr* that "[n]o evidence was presented during the 1958 proceeding concerning the historical use of the water rights decreed to the original points of diversion." 753 P.2d at 1225. We had rejected Westminster's claim of *res judicata* because the 1958 proceeding involving a change in point of diversion "did not immunize the City of Westminster against subsequent equitable actions by junior appropriators designed to maintain the historic level of use by the City of its decreed rights." *Westminster*, 167 Colo. at 9, 445 P.2d at 56. We acknowledged, relying on *Southside*, that the term "historic use" was not very prevalent in this court's prior decisions but that the law of appropriation and use in Colorado has long proscribed changing or enlarging existing water rights to the injury of other existing rights.[7] *See id.*

## B.

*Collateral Attack Is Barred As To Previous Judicial Determinations Of Historic Usage Under The FMIC Water Rights*

■ Unlike the circumstances in *Orr*, here historic usage of the FMIC water rights was determined in previous water court cases that fixed the augmentation credit available to each share of the mutual ditch company's stock as of 1992. The water court was correct in concluding that the prior determinations cannot be reopened through a collateral attack. A water court judgment involving the same matter, even if wrong, is not subject to redetermination when the court had jurisdiction over the subject matter of the application and other water rights potentially affected thereby, through publication of ade-

quate notice. *See Bijou Irrigation Co.*, 926 P.2d at 82–83; *Green v. Chaffee Ditch Co.*, 150 Colo. 91, 99–100, 371 P.2d 775, 779–80 (1962).

■ Faced with a contention that a claim is barred from being relitigated in the case before it, a water court must determine whether: (1) the court entering the prior judgment possessed subject matter jurisdiction; (2) the same subject matter and claim or cause of action are involved in both cases; and (3) the party seeking to litigate an issue or claim should be bound by the prior determination. *See State Eng'r v. Smith Cattle, Inc.*, 780 P.2d 546, 549–52 (Colo.1989); *see also Closed Basin Landowners Ass'n v. Rio Grande Water Conservation Dist.*, 734 P.2d 627, 637 (Colo.1987) ("a judgment entered within the jurisdiction of the court, even though wrong, is not subject to collateral attack"). On the other hand, an adjudication decree cannot become final and effective "as to parties without notice who did not participate or accept its benefits or have knowledge of its rendition." *See Quirico v. Hickory Jackson Ditch Co.*, 126 Colo. 464, 470, 251 P.2d 937, 940 (1952).

Under the 1969 Act, Colorado now employs a system of water divisions, organized on a watershed basis, to adjudicate rights to waters of natural streams within the state. Water judges assigned by the Chief Justice are accustomed, in the context of an ongoing adjudication, to hearing and determining matters involving the interrelationship of decreed water rights, their administration, and questions of injury addressed through expert testimony and decree determinations. *See Colorado Ground Water Comm'n v. Eagle Peak Farms, Ltd.*, 919 P.2d 212, 218–20 (Colo.1996). Because of Colorado's unique resume notice procedure for publishing claims and obtaining jurisdiction in water cases, judicial findings made in water cases under the 1969 Act are rarely subject to collateral attack in subsequent cases for lack of notice. *See Board of County Comm'rs v.*

---

7. *See also Comstock v. Ramsay*, 55 Colo. 244, 254, 133 P. 1107, 1110 (1913) ("We take judicial notice of the fact that practically every decree on the South Platte River, except possibly only the very early ones, is dependent for its supply, and

for years and years has been, upon return, waste and seepage waters."); *Southeastern Colo. Water Conservancy Dist. v. City of Florence*, 688 P.2d 715, 716 (Colo.1984) ("The Arkansas River is severely over-appropriated. . . .").

*Collard,* 827 P.2d 546, 552 (Colo.1992) (recognition of private instream flow right erroneous but not subject to collateral attack); *cf. Dallas Creek,* 933 P.2d at 38. But, changes of water rights effectuated without adequate notice will not be recognized. *See Broyles v. Fort Lyon Canal Co.,* 638 P.2d 244, 250 (Colo.1981).

 Under the 1969 Act, water courts have jurisdiction, based upon an adequate application and resume notice, to adjudicate the amount of water allocable to each share for augmentation plan replacement purposes, *see* § 37–92–302(1)(a), 15 C.R.S. (1990), calculated upon the historic usage of a ditch company's tributary water right; *see* § 37–92–305(4)(a), 15 C.R.S. (1990). In reviewing whether subsequent litigation is barred by *res judicata,* including its collateral estoppel component, a water court examines the resume notice and the ensuing court judgment and decree in the prior proceeding to determine which matters were at issue then and are foreclosed from being redetermined in the current proceeding. *See Closed Basin Landowners Ass'n,* 734 P.2d at 632–33; *City & County of Denver v. Consolidated Ditches Co. of Dist. No. 2,* 807 P.2d 23, 32 (Colo. 1991). The water court may take judicial notice of its prior determinations and decrees in historic use, change, and augmentation plan cases involving the same water right. The creation of water divisions and the appointment of water judges on a watershed basis to make findings of fact and conclusions of law necessarily anticipates reliance on prior judgments and decrees as to noticed, adjudicated claims regarding a water right.

 Pertinent decrees and water administration records are included as exhibits in the record before us. We conclude that: (1) the water court had jurisdiction to enter both the Security decree and the judgment and decree in this case; (2) the subject matter of historical usage under the FMIC water rights prior to 1992 for the purpose of augmentation credit in the Security plan and the Midway Ranches plan is the same; and (3) Greenview Trust is bound by the prior court judgments and decrees with regard to the nature and extent of historical usage of FMIC water rights prior to 1992. Accordingly, Greenview Trust is precluded from litigating claims which it could have brought when historical usage under the FMIC system was previously at issue and actually determined. *See United States v. Jesse,* 744 P.2d 491, 503–04 (Colo.1987); *cf. Bijou Irrigation Co.,* 926 P.2d at 82–83.

 The application of *res judicata,* including its collateral estoppel component, in appropriate circumstances is important to the stability and reliability of Colorado water rights. Mutual agricultural ditch companies with senior water rights are a primary source of water for augmentation to allow new and different uses to occur whose very junior status would otherwise shut them out of the priority system entirely. *See Great Western Sugar Co. v. Jackson Lake Reservoir & Irrigation Co.,* 681 P.2d 484, 493 (Colo.1984). A shareholder of such a company enjoys a *pro rata* ownership of the water rights of that company. *See Left Hand Ditch Co. v. Hill,* 933 P.2d 1, 3 (Colo.1997). The value of a mutual ditch company share as an ownership interest in a Colorado water right is based on the yield of the water right operated in priority during supply shortages requiring curtailment of rights not in priority with regard to the available supply. *See Navajo Dev. Co. v. Sanderson,* 655 P.2d 1374, 1377 (Colo.1982).

By our decision in this case, we do not hold that *res judicata* should bar the water court from addressing circumstances which have changed subsequent to the previous determination, nor does this doctrine preclude the water court from determining historic use in a change, augmentation, or expanded use injury case when such historic use has not been determined in a previous proceeding. In *Boulder & White Rock Ditch & Reservoir Co. v. City of Boulder,* 157 Colo. 197, 203, 402 P.2d 71, 74 (1965), prior to the adoption of the 1969 Act, we upheld a change decree based on detailed findings of fact which analyzed the prior use of the water right based on evidence which actually demonstrated decreased use rather than the alleged increased use. We said that each change case must rest on "circumstances as they are found to exist at the time the change is requested,"

and *res judicata* does not preclude an inquiry into the changed circumstances. *Id.*

However, when historical usage has been quantified for the ditch system by previous court determination, the yield per share which can be removed for use in an augmentation plan is not expected to differ from augmentation case to augmentation case, absent a showing of subsequent events which were not previously addressed by the water court but are germane to the injury inquiry in the present case.[8]

Greenview Trust also seeks to invoke *In re Steffens,* 756 P.2d 1002 (Colo.1988), as controlling the case before us. In *Steffens,* we concluded that diversion of multiple junior and senior water rights through a single headgate would make impossible a determination regarding injury to other water rights, facts which are distinct from those existing here. *See* 756 P.2d at 1007.

In this case, the water commissioner for the affected stream reach testified that FMIC water rights are administered in the order of priority which is in effect at the time diversions are made from the river and measured into the ditch. He stated that water officials employ Colorado's system of computerized monitoring stations and satellite relay to obtain reporting of actual stream flow levels every fifteen minutes, with information down loaded every four hours. The calling priorities and the resulting curtailment orders are adjusted to reflect actual stream conditions. The FMIC diversion work has a flume by which to ascertain flow of water into the system out of the river. Four stream gauges located on various reaches of Fountain Creek upstream of its confluence with the Arkansas River are utilized to monitor instream water levels. Diversion and augmentation release records are kept which show the extent to which FMIC's water rights are utilized.

■■■ The water commissioner testified that the Midway Ranches augmentation plan is capable of administration, a matter of evident concern to the water judge during trial of the case which the court resolved in favor of the plan based on the evidence. *See* § 37–92–305(8). We cannot presume that the water officials will fail to discharge their duties in distributing the available water supply according to applicable decrees and priorities. *See* § 37–92–301(3), 15 C.R.S. (1990); *Aspen Wilderness Workshop, Inc. v. Hines Highlands Ltd. Partnership,* 929 P.2d 718, 725–26 (Colo.1996).

■■■ In the case before us, the water court correctly employed a combination of *res judicata* and evidence at trial in determining the augmentation credit available for use in the augmentation plan of Midway Ranches from the FMIC shares. Evidence of changed circumstances since the prior findings regarding the FMIC water rights was allowed and considered. The water court's judgment and decree is supported by the record, except in two respects. The case must be remanded for a decree revision to identify the FMIC water rights which Midway Ranches may rely upon *pro rata* for use in its augmentation plan, by priority number, amount, and appropriation and adjudication dates, pursuant to section 37–92–304(7), 15 C.R.S. (1990). We also remand for a revision of the decree to limit FMIC to 5,800 shares, absent court review of proposed additional share issuance.

■■■ FMIC stipulated on the record at trial that it would limit the number of its shares to 5,800, even though its articles of incorporation authorize issuance of 6,000

---

8. In contrast is our decision in *Shirola.* There, small capacity domestic well owners were not permitted to raise injury issues in an augmentation plan case because the court ruled that they did not possess vested water rights that had been adjudicated, and, therefore, lacked standing. Our observation that "[g]eneral principles of law dictate that an individual cannot be bound by the outcome of a proceeding to which he or she was not a party" was stated in the context that small capacity well owners "were not permitted to assert injury to their wells." 937 P.2d at 753. The standing of small capacity well owners to assert injury to their rights in an augmentation plan case had not been addressed as a matter of Colorado law prior to *Shirola,* and the objectors before the water court had entered the case and appealed from the court's adverse ruling to obtain appellate determination of the applicable law.

shares.[9] FMIC stipulated that additional share issuance would be contingent on a showing to the water court that increasing the number of shares above 5,800 would not dilute the 0.7 acre-foot of water yield per share. At the time of trial, Gary Thompson testified that current conditions of FMIC at the level of 5,800 shares continued to support the accuracy of the prior 0.7 acre-foot per share historic use determination. Consequently, FMIC's stipulation was an important component of Thompson's expert opinion that the Midway Ranches augmentation plan was designed to alleviate injury to other vested rights. Stipulations made in water cases are both judicial admissions and contracts, and are enforceable. *See USI Properties East, Inc. v. Simpson*, 938 P.2d 168, 175 (Colo.1997).

The water court's findings on the issue of dry-up are entitled to deference, *see Bijou Irrigation*, 926 P.2d at 88–89, and adequate evidence exists in the record to support the court's determination that a dry-up covenant is not required in connection with the Midway Ranches augmentation plan. Increasing urbanization, the use of augmentation structures to remove water from the ditch, and policing of water distribution and use to shareholders by FMIC should prevent reirrigation of lands historically irrigated under this system. Thompson's engineering report in this case stated that the lands formerly irrigated by the Midway Ranches shares had been dried up. The court's re-

tained jurisdiction in the various approved augmentation plans utilizing FMIC water rights can be invoked in the future to consider and impose a dry-up covenant, if necessary.

Likewise, the water court properly ruled that the issue of abandonment by FMIC of a portion of its water rights was untimely asserted at trial. Abandonment is not favored under Colorado water law. Valuable property rights are lost by partial or total abandonment of a water right. Thus, intent to abandon on the part of the appropriator must be proved. *See City & County of Denver v. Middle Park Water Conservancy Dist.*, 925 P.2d 283, 286 (Colo. 1996). The whole or the part of the water right which is the subject of a change or augmentation proceeding could not be used for any purpose if abandonment had occurred.[10] Consequently, an objector seeking to have abandonment declared must give timely notice, prior to trial, that abandonment is being asserted.

### III.

Accordingly, we affirm the judgment and decree of the trial court in part and reverse in part. We remand for revision of the decree to include: (1) identification of the FMIC water rights which are to be utilized *pro rata* in the augmentation plan; and (2) limitation of FMIC to 5,800 shares, absent

9. Mr. Janitell, president of the ditch company and Mr. Pratt, Midway Ranches' counsel, engaged in the following colloquy on the record:
But basically I'm comfortable with the fact that it's right at fifty-eight hundred shares.
Q. Mr. MacDougall has raised a concern about the possible dilution of the water rights of shareholders if additional treasury shares were issued up to perhaps a maximum of six thousand shares.
Would the company agree to a provision in this decree that says that the company will not issue additional outstanding shares without sufficient water being provided in compensation for the issuance of those shares so that there is no dilution of the amount of water available per share to the shareholders of the company?
A. I believe we would, on advice from our counsel.

Q. The effect of that, then, would be to preserve the amount of water available per share and to preserve the seven-tenths per share consumptive use number?
A. I believe so. That would be in the best interests of our shareholders.
This colloquy was reaffirmed by Mr. Monson, FMIC's counsel, at the January 16, 1996 decree conference and was clearly intended to be a stipulation designed to affect the outcome of the proceedings and obtain a decree which continued to recognize the validity of the 0.7 acre-foot per share yield allocation.

10. While water court cases declaring abandonment have usually dealt with an entire right, partial abandonment may also be found by a court to have occurred. *See* § 37–92–301(5), 15 C.R.S. (1996 Supp.).

court review, to safeguard against dilution of the 0.7 acre-foot yield per share.[11]

11. We reject Midway Ranches' assertion that this appeal was frivolous.