## No. 14,764.

### DRY CREEK NO. 2 DITCH COMPANY ET AL. *v.* COAL RIDGE DITCH COMPANY.

(129 P. [2d] 292)

Decided June 1, 1942. Rehearing denied September 28, 1942.

Mr. EDWARD AFFOLTER, Mr. HAROLD P. MARTIN, Mr. JACOB S. SCHEY, Mr. THEO. D. SCHEY, JR., for plaintiffs in error.

Mr. F. S. LUETHI, Mr. WILLIAM R. ARTHUR, JR., for defendant in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

THIS case is before us on writ of error to review a judgment of the district court of Boulder county in favor of the defendant in error, to which we hereinafter refer as petitioner, and against plaintiffs in error, hereinafter mentioned as respondents.

The one question involved is the right to change the point of diversion of two certain water rights owned by petitioner in Water District No. 6. An unusual factor is that petitioner, prior to 1934, had actually changed the point of diversion—in the case of one of its water rights for a period of nearly twenty years and in the case of the other for a period of nearly thirty years—to the point where the trial court has now given its sanction that the diversion may be made. In 1934 the then water commissioner for District No. 6 notified petitioner that he could not authorize any further taking of water from the stream at the point where it was being diverted unless it obtained an order of court authorizing such diversion. Petitioner subsequently made some attempt

to sell these water rights, but failing to make a satisfactory deal commenced the present action in 1939.

This situation arose as a result of the following facts disclosed by the record. About 1904 Dennis Sullivan owned several thousand acres of land in the western part of Weld county. In order to procure water for its irrigation he constructed the Baseline Reservoir at the upper end of Dry Creek in Boulder county as one of its sources of supply. He purchased the site of the reservoir, consisting of about 220 acres, together with the water rights which had been used in the irrigation of said land. These water rights consisted of the South and Central Ditches and five shares of the capital stock of the Enterprise Irrigating Ditch Company, a mutual corporation. Petitioner through mesne conveyances succeeded to the ownership of the above described property. A predecessor in interest of petitioner thereupon took steps to bring the water thus acquired to its lands. By a decree of the district court of Boulder county filed in the October 1912 term (referred to in respondent's brief as of date July 22, 1913), it was authorized to change the point of diversion of the South and Central Ditches from their original point of diversion at the site of the Baseline Reservoir and bring the South and Central water down, emptying it into Dry Creek, thence into the Cut-off or Bull Ditch, through Bull Ditch into the Lower Boulder Ditch, through the Lower Boulder Ditch to the headgate of the Coal Ridge Ditch, and through the Coal Ridge Ditch to the various laterals supplying the Coal Ridge land, thus involving a change in place of use as well as change of point of diversion of the water—the Coal Ridge lands being approximately thirty-five miles distant from the Baseline Reservoir where the water had formerly been used. The Coal Ridge Ditch Company, after the purchase of these water rights and the aforesaid decree of court covering the South and Central Ditches, not only brought the South and Central water down to the Coal Ridge lands in

Weld county, but also brought down the water represented by the Enterprise stock, mingling it with the South and Central water.

In 1915 petitioner acquired 2–58/96 second feet of the Dry Creek (Wm. A. Davidson) priority No. 7 (equivalent of 100 inches of water), the headgate of this ditch on Dry Creek being three miles below the headgate of the Enterprise Ditch which in turn is located near where Dry Creek branches off of South Boulder Creek. Thereafter the water from that priority was conveyed along with the above mentioned South, Central and Enterprise water, and by the same route, to the Coal Ridge lands thirty-five miles away. This Davidson water, prior to purchase, was being used on the so-called Penfold land situate just west of Dry Creek where it empties into Boulder Creek.

It thus appears that after 1915 we find these four water rights being diverted to the Coal Ridge lands through the course above noted — the water rights of the South and Central Ditches by virtue of the diversion decree entered during the October 1912 term of the district court above mentioned, and the Davidson and Enterprise water without any decree permitting diversion. All four water rights are based upon the general water adjudication of date June 2, 1882, and subsequent modifying decrees, and are as follows: South Ditch, being Priority No. 19 (June 1, 1866) 1 cu. ft. Central Ditch, being Priority No. 16 (May 15, 1866) 2–2/3 cu. ft. Enterprise Ditch (5 shares), being Priority No. 12 (1865) 3.872 cu. ft. Dry Creek Davidson, being Priority No. 7 (1863) 2–58/96 cu. ft. Expressed in another way, petitioner's predecessor, after the purchase of the Davidson Dry Creek water in 1915, had a total of 10.143 cubic feet per second of time out of or near the head of Dry Creek, of which 3.666 cubic feet was covered by a decree permitting diversion to the Coal Ridge Ditch, there being no decree permitting diversion of the remaining 6.477 cubic feet, but which, nevertheless, followed the same

course to the Coal Ridge lands as the water covered by the diversion decree.

At this point a word as to the topography of the area involved is in order. Dry Creek is a descending branch diverging from the east bank of South Boulder Creek at the southwest corner of section 3, township 1 south, range 70 west, in Boulder county, and running thence northeasterly for about six miles, discharging into Main Boulder Creek at a point near the center of section 17, township 1 north, range 69 west. From the point where Dry Creek diverges, South Boulder Creek flows north for a distance of about three miles where it empties into Main Boulder Creek in the southeast quarter of section 22, township 1 north, range 70 west, about four miles west and upstream from the mouth of Dry Creek.

The dam of the Baseline Reservoir was constructed across the channel of Dry Creek, and a canal, called New Dry Creek, was constructed around the south side of the reservoir to convey the water belonging to the lower ditches and the Coal Ridge Ditch Company around the reservoir, and discharge it into Dry Creek below the reservoir without conveying it through the latter.

The Lower Boulder Ditch has its headgate on the south bank on Main Boulder Creek in the southwest quarter of section 16, township 1 north, range 69 west, about three-fourths of a mile below the mouth of Dry Creek, extends easterly and terminates in the northwest quarter of section 25, township 2 north, range 68 west, in Weld county. The Coal Ridge Ditch is a continuation of Lower Boulder Ditch, extending east across township 2, range 67 west, terminating in section 13 of said township and range.

At the time the reservoir was constructed, or shortly thereafter, a ditch designated in the evidence the "Cut-off Ditch" or the "Bull Canal" was constructed beginning on Dry Creek, about one-fourth of a mile above where it discharged into the Lower Boulder Ditch, for

the purpose of carrying water flowing down Dry Creek, to which the Lower Boulder Ditch, Sullivan and his successors in interest, including petitioner, were entitled, without discharging it into Main Boulder Creek, and thereafter again diverting it through the headgate of Lower Boulder Ditch. This cut-off was abandoned in 1918, and thereafter said water flowed from Dry Creek into Boulder Creek and was then taken back through the Lower Boulder headgate into Lower Boulder Ditch.

All of the ditch companies who appear as respondents and who protest the change of point of diversion have decreed priorities for irrigation purposes out of South Boulder Creek, except the Boulder and White Rock Ditch Company. The latter company has a decreed priority for irrigation purposes out of Boulder Creek—its ditch being above the point where South Boulder Creek joins Boulder Creek about seven and one-half miles upstream from the headgate of the Lower Boulder Ditch. The seven individual respondents own interests in the Dry Creek Davidson Ditch, and except for them the priorities of all of the ditches owned by respondents in this proceeding are junior in point of time to the priority of the Dry Creek Davidson Ditch.

It has already been noted that the Coal Ridge lands, upon which it is proposed to apply this water by reason of the proposed change in the point of diversion, although located in the same water district (No. 6) as the lands upon which the water represented by the respective priorities were applied, are in a different county, namely, Weld. The evidence also shows that the runoff from some of these lands enters St. Vrain Creek, and from the remaining lands goes into the South Platte River. It is therefore admitted that none of the runoff from the Coal Ridge lands returns to Boulder Creek, which is a tributary of St. Vrain Creek, which in turn is a tributary of the South Platte River.

It also appears that the headgates of the Enterprise and Dry Creek Davidson ditches are about six and three

miles respectively above the headgate of the Lower Boulder Ditch, measured by following the course of Dry Creek from the respective headgates down to the mouth of Dry Creek and then down Boulder Creek to the headgate of the Lower Boulder Ditch. The decree entered by the trial court provides for the diverting of petitioner's Dry Creek Davidson and Enterprise priorities through the headgate of the Lower Boulder Ditch, without any diminution in the amount of water, to be turned into the Lower Boulder Ditch.

Such are some basic and undisputed facts appearing in the record which comprises approximately 1000 pages of exhibits and testimony.

A number of protesting respondents testified that they had never been aware that a new point of diversion was being used for Enterprise and Davidson water. There is other evidence indicating that a prior water commissioner and various other persons knew of the changed point of diversion. In any event, the petitioner in its argument does not rely upon the running of any statute of limitations in its favor nor upon its acquiring a vested right in the changed point of diversion by prescription. For, even if a former water commissioner had actually in practice permitted it to make the diversion at the Lower Boulder Ditch, it acquired no right under the Colorado statute which prescribes the procedure for procuring a change in the point of diversion. In making an unauthorized diversion it exposed itself to what finally did happen in 1934. One bit of evidence shows that a ditch rider, finding that the Enterprise-Davidson water was being transmitted to the Coal Ridge lands at the same point of diversion as the South and Central water, reported the matter to the then water commissioner, and after conferences among the officials having jurisdiction in the matter petitioner was ordered to cease diverting the water without first obtaining an order of court. Neither, on the other hand, were the respondents held to be estopped to protest the

change in the point of diversion, even though there was some evidence that might ascribe knowledge of the actual changed point of diversion to some individuals connected with the respondent companies. Certainly from aught that appears in the evidence an examination of the tax records of Boulder county might have disclosed the fact that petitioner's irrigated lands were not located in that county but in the adjoining county of Weld.

An examination of the record discloses the fact that the trial court conducted its hearing on the merits of the case, just as was done in the case of *New Cache la Poudre Irrigating Co. v. Arthur Irrigation Co.*, 37 Colo. 530, 87 Pac. 799. In that case the point of diversion had been changed in 1884 and the new point continuously used thereafter until 1900. The law prescribing the procedure for changing the point of diversion of water was passed in 1899, and the water commissioner in 1900 refused to recognize the point of diversion that had been used since 1884. We held in the New Cache la Poudre Company case that the district court had no jurisdiction to require the water commissioner to recognize a change in the point of diversion by an owner who had not complied with the provisions of the act; that the obtaining of an order allowing a change in the point of diversion is in effect a modification or change in the adjudication decree; and we held that the act of 1899 was passed "In order to protect officials in the discharge of their duties in distributing water, to preserve the peace, to prevent a multiplicity of suits, to relieve the officer from being required to ascertain, at his peril, any of the various questions which he might be required to consider when requested to change the point of diversion, and, finally, that there may be a judicial ascertainment of the right to such change, which shall bind all parties and not leave the place of diversion to the whim of interested parties."

Although a great deal of testimony was introduced on the issue of whether the change in the point of diversion

would injuriously affect any one or more of the respondents, counsel for the latter allude to the fact that, by reason of the lapse of time since petitioner or his predecessor in interest first changed the point of diversion for the Enterprise and Davidson water, very little testimony was obtainable regarding the conditions existing prior to the unauthorized diversion; that of the twenty-seven witnesses called by the parties to the suit, only three, namely, George Hogan, Frank DeBacker and John Prince, residents of Boulder county for 65, 76 and 69 years respectively, could remember anything about the facts and conditions in respect to the former use of the Enterprise water before its point of diversion was changed in 1904 and in respect to the Davidson water before its change in 1914. The testimony of qualified engineers also was sharply conflicting.

Against the claim of injury by reason of the fact that the runoff from the land formerly irrigated by the Enterprise and Davidson water would be lost by this proposed change of diversion, was the evidence of seepage from the Baseline Reservoir, and petitioner's Exhibit S is the record of a suit filed June 25, 1926, against the Baseline Land & Reservoir Company for damages on account of seepage. It was further argued that, although the runoff from the Coal Ridge lands would not be used on the lands tributary to the Boulder, nevertheless it would be available to appropriators on the St. Vrain and South Platte who had priorities earlier than the priorities of the petitioner.

Respondents claim that the effect of this change of diversion and of the decree authorizing it is to enlarge the use of the water and that they will therefore be injured. The decree specifically provides: "(c) That nothing in this decree shall be construed to authorize any enlarged use of the water awarded to said Dry Creek Ditch (claim of Wm. A. Davidson) or to said Enterprise Ditch under their original decrees of June 2, 1882, or the decree of August 1, 1914, either in quantity

of water diverted or in time of use thereof." We therefore believe that it conforms to the holding in *Larimer County Canal No. 2 Irrigating Co. v. Poudre Valley Reservoir Co.*, 23 Colo. App. 249, 129 Pac. 248, that "an order permitting a change in point of diversion does not, and cannot, in any way, enlarge the right of its recipient by conferring upon him the power to divert a greater quantity of water from the stream than he theretofore took, nor permit him to 'use it for a longer length of time than he was previously entitled to." We have held that if the petitioner in an action to change the point of diversion of water, after obtaining a decree permitting the change, enlarges or attempts to enlarge the use of his appropriation to the injury of respondent, the permissive decree will not bar relief to the latter. *New Cache la Poudre Irrigating Co. v. Water Supply & Storage Co.*, 74 Colo. 1, 218 Pac. 739.

■ Testimony of the various witnesses as to whether the proposed change in the point of diversion would injure respondents was sharply conflicting. Witnesses for petitioner laid stress on the fact that respondent ditch companies had their headgates on the South Boulder and that the runoff from the lands formerly watered by the Enterprise and Davidson water rights flowed into Dry Creek or Boulder Creek direct, and that therefore said respondents would not be affected by the change. It may be noted in respect to the comment that few witnesses could remember conditions prior to the actual diversion of the Davidson and Enterprise waters in the early part of this century, that the court decree authorizing the change in the point of diversion of the South and Central waters—where the situation was similar to the instant case—was made when the facts as to prior conditions were fresh in the minds of all the parties. After an examination of the record we cannot say that there was insufficient competent evidence to sustain the decree of the trial court authorizing the change. We have held that a decree granting a

change in point of diversion based upon competent testimony will not be disturbed on review. *Farmers' Reservoir & Irr. Co. v. Lafayette,* 93 Colo. 173, 177, 24 P. (2d) 756.

■ A matter deserving mention is the fact that the record discloses contradictory evidence given by the two qualified civil engineers — one testifying on behalf of each side in this case — regarding the allowance that should be made for loss from evaporation and seepage by reason of the additional mileage in carrying the water downstream to the new point of diversion. The engineer for respondents insisted that a very large percentage allowance should be made, while the engineer for the petitioner stated that the percentage of loss would, in the case of the transfer of Enterprise water, be minimum, and in the transfer of the Davidson water the loss would be nominal. We note that neither the findings nor the decree of the trial court covers this particular phase of the litigation. Inasmuch as in proceedings of this character one of the purposes of the statute is the protection of all other appropriators and holders of water rights in the district concerned, we believe it proper that there should be a supplemental finding and decree on this point.

The judgment is accordingly affirmed, conditioned that the cause be remanded with directions to the trial court to make further findings as to deductions, if any, which should be made from the amount of water to be transferred on account of evaporation and seepage occurring between the original point of diversion and the new one. Such findings may be based upon the evidence now before the court or upon additional testimony to be properly introduced, or upon both, as the court may be advised.

Mr. Justice Bakke not participating.