**FARMERS HIGH LINE CANAL AND RESERVOIR COMPANY; and City of Westminster; City of Thornton, and City of Arvada, Plaintiffs–Appellants,**

**and**

**Farmers Reservoir and Irrigation Company Plaintiff–Appellant/Cross–Appellee,**

**v.**

**CITY OF GOLDEN, Defendant–Appellee/Cross–Appellant,**

**and**

**Richard Stenzel, Division Engineer, Water Division 1, Appellee pursuant to C.A.R. 1(e).**

**No. 97SA343.**

Supreme Court of Colorado, En Banc.

March 29, 1999.

Gaunt, Dirrim, Coover, P.C., Lysle R. Dirrim, Brighton, Colorado, Attorney for Farmers High Line Canal and Reservoir Company.

Carlson, Hammond & Paddock, Mary H. Hammond, Lee H. Johnson, Denver, Colorado, Attorneys for City of Westminster.

White & Jankowski, LLP, Austin C. Hamre, Michael D. White, David C. Taussig, Denver, Colorado, Attorneys for City of Thornton.

Moses, Wittemyer, Harrison and Woodruff, P.C., David L. Harrison, Veronica A. Sperling, Kelly J. Custer, Boulder, Colorado, Attorneys for City of Arvada.

John P. Akolt, III, Brighton, Colorado, Attorney for Farmers Reservoir and Irrigation Company.

Porzak Browning & Johnson, LLP, Glen E. Porzak, Steven J. Bushong, Boulder, Colorado; Trout & Raley, P.C., James Witwer, Denver, Colorado, Attorneys for the City of Golden.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Steven O. Sims, First Assistant Attorney General, Natural Resources Section, Denver, Colorado, Attorneys for Richard Stenzel, Division Engineer, Water Division No. 1.

Timothy R. Buchanan, P.C., Timothy R. Buchanan, Arvada, Colorado, Attorney for Amicus Curiae Fort Morgan Reservoir and Irrigation Company.

John M. Dingess, Denver, Colorado, Attorney for Amicus Curiae City of Aurora.

Patricia L. Wells, Michael L. Walker, Casey S. Funk, Amy M. Cavanaugh, Denver, Colorado, Attorneys for Amicus Curiae City and County of Denver.

Chrisman, Bynum & Johnson, P.C., David G. Hill, Jack M. Graves, Boulder, Colorado, Attoreys for Amicus Curiae City of Englewood.

Leavenworth & Tester, P.C., Loyal E. Leavenworth, Glenwood Springs, Colorado, Attorney for Amicus Curiae City of Rifle.

Brian M. Nazarenus, Denver, Colorado, Attorney for Amicus Curiae for the City of Loveland.

Justice RICE delivered the Opinion of the Court.

The appellants, Farmers Reservoir and Irrigation Company, Farmers High Line Canal and Reservoir Company, and the cities of Westminster, Thornton, and Arvada, appeal from a judgment of the water court which dismissed their complaint for declaratory judgment and their request for injunctive relief based on allegations that the City of Golden ("Golden") has expanded its water use beyond the scope of its decrees. We affirm the water court's dismissal of the appellants' first cause of action requesting the addition of volumetric limitations to two of Golden's water rights decrees. We hold that appellants are precluded from seeking a modification of the decrees at issue because the decrees are unambiguous and because an earlier change in use proceeding fully litigated the terms and conditions of the decrees necessary to prevent injury to junior appropriators.

As the terms and conditions of the decrees at issue may not be reopened, we do not address the merits of the appellants' argument that issue preclusion binds Golden to specific representations it may have made regarding the volumetric limits of its decrees during judicial proceedings occurring subsequent to the issuance of the decrees at issue. Accordingly, we affirm the water court's dismissal of the appellants' cross-motion for summary judgment as to issue preclusion.

We further affirm the water court's dismissal of appellants' cross-motion for summary judgment as to judicial estoppel. In so doing, we defer to the water court's finding that Golden did not take contradictory positions in two judicial proceedings as to the terms and conditions of the decrees at issue.

We also affirm the water court's denial of appellants' second claim for relief, namely, that Golden has impermissibly enlarged its use of water under the decrees at issue by changing the water usage from a peak flow right to a base flow right. We hold that litigation of this claim is not precluded by the earlier change proceedings regarding the decrees at issue. However, we defer to the water court's finding that there has been no significant change in the pattern of Golden's use in this respect.

With respect to the appellants' third claim for relief, namely, that Golden has impermissibly enlarged its use of water under the decrees at issue by increasing the total lawn acreage under irrigation, we hold that litigation of this claim is not precluded. As the water court made no findings of fact with respect to this issue, we remand for further proceedings consistent with this opinion.

I.

A history of the water right at issue will be of assistance to our discussion of the issues in

this case. The disputed water right is known as the Clear Creek Priority 12 (hereinafter "Priority 12"). It was originally decreed in October of 1884, with an appropriation date of May 1861. As such, the water right presently at issue is among the most senior water rights in the South Platte basin; in fact, it is junior only to 209 rights out of a total of more than 36,000 rights. At present, the appellee, Golden, and one of the plaintiffs below, Con Mutual, own the majority of Priority 12.[1] The appellants, Farmers Reservoir and Irrigation Company, Farmers High Line Canal and Reservoir Company, Westminster, Thornton, and Arvada, all own Clear Creek water rights which are junior to and affected by Golden's and Con Mutual's use of Priority 12.

## A. The 1960s Proceedings

Two 1960s water rights decrees are relevant in the instant case. The first of these arose in October 1957, when Golden approached then-owners of Priority 12, James Mannon and William Vaughn, with an offer to purchase a portion of their rights. While Mannon and Vaughn had used the water to irrigate agricultural lands, Golden sought to use it for municipal purposes. Therefore, before this sale could be effectuated, the owners had to petition the water court for a decree permitting a change in use from agricultural irrigation to municipal uses.[2]

Several parties with water rights junior to Priority 12 filed objections to this change petition. They argued that the change in use would permanently remove a greater amount of water from the stream than the amount previously removed by the agricultural users. As a result, a trial was held in order for the court to determine whether the proposed change would harm junior appropriators.

At trial, Golden's expert water engineer, W.W. Wheeler, testified that the requested change in use would not harm junior users.[3] According to Wheeler, Golden would "balance" its municipal use so as not to consume any more water than had been traditionally consumed through irrigation. Wheeler testified that Mannon and Vaughn had historically consumed approximately 175 acre-feet of water per year under their Priority 12 decree. Wheeler further testified that if the change in use were decreed, Golden would apply thirty-six percent of its Priority 12 water to the irrigation of 138 acres of lawn. He further testified that lawn consumptive use rates ranged between seventy-five and ninety percent. Wheeler testified that the other sixty-four percent of Golden's water under this decree would be applied to household uses. Wheeler noted that household consumptive use is negligible, having a consumptive use rate of only one and one-half percent. Finally, he testified that based on the foregoing pattern of municipal water usage, 2.86 cubic feet per second ("c.f.s.")[4] of water could be transferred to Golden without enlarging the right to the detriment of junior appropriators.

Despite Wheeler's testimony, the water court denied the change in use petition at the close of the petitioners' case. The court concluded that the petitioners' evidence failed to demonstrate that the change would not injure junior appropriators. In Mannon and Vaughn's subsequent appeal, we reversed the water court. *See Mannon v. Farmers' High Line Canal & Reservoir Co.*, 145 Colo. 379, 360 P.2d 417 (1961). In *Mannon*, we held that, whenever possible, the water court must assist a petitioner in fashioning decree limitations which will prevent injury to junior users. *See id.* at 390–91, 360 P.2d at 423. We remanded the case with instructions to the water court to determine

1. Consolidated Mutual ("Con Mutual") is not a party to this appeal, as it has resolved its differences with Golden out of court.

2. The petition also requested a change in the point of diversion from the Lee, Stewart, and Eskins ditch to the Church ditch.

3. While Golden was not a named party to the 1960 litigation, it was a real party in interest.

4. Two different measurements are relevant to any water rights decree: acre-feet and cubic feet per second. The former is a measure of the volume of water, whereas the latter is a measure of the flow of water which may be diverted from a stream.

whether a change decree with limiting conditions would be sufficient to prevent injury to junior users as a result of the transfer. However, before the water court could review this issue anew, the parties entered into a court-approved consent decree.

While this consent decree limited the maximum annual flow Golden could divert to 2.86 c.f.s., it did not contain an express volumetric limitation, stated in acre-feet, on the amount of water Golden could consume each year. The decree further provided that Golden's rights would be subject to several terms and conditions designed to "prevent injury to vested rights of others on Clear Creek." First, Golden was required to permanently dry up the lands which Mannon and Vaughn had previously irrigated with Priority 12 water. The decree further required Golden to abandon back to Clear Creek 0.84 c.f.s. of the water previously owned by Mannon and Vaughn. Finally, in keeping with the previous agricultural use of the right, Golden's right to divert was limited to the months of May through October.

The second decree at issue in this case arose when Golden purchased an additional 1.8 c.f.s. of Priority 12 water from then-owners Mauz and Thuet. This transfer was effectuated by a consent decree entered into in September of 1964. This decree, like the 1961 decree, involved a change from agricultural to municipal use.[5]

As the parties entered into the consent decree before a trial on the issue of potential injury was held, W.W. Wheeler did not give testimony on the record regarding this change in use petition. He did, however, prepare the engineering study that formed the basis for the terms agreed upon by the parties to the consent decree. Wheeler's study reveals that the historical consumptive use associated with the previous agricultural use of this right was approximately 199 acre-feet per year. Applying the same knowledge regarding Golden's municipal use patterns

that he relied upon in the first change proceeding, Wheeler concluded that 1.8 c.f.s. of water could be transferred to Golden for municipal use without enlarging upon the right to the detriment of junior appropriators.

While this second consent decree stated an express flow limitation, it did not contain an express volumetric limitation on Golden's consumption. Moreover, the decree contained dry up and abandonment provisions similar to those included in the 1961 decree. The decree also limited Golden's diversions to the months of May through October.

Wheeler's engineering studies and testimony in the 60s proceedings indicated that the total historical consumptive use associated with Golden's two Priority 12 decrees was approximately 374 acre-feet per year. Wheeler testified that after these rights were changed from agricultural use to municipal use, Golden's annual approximate consumptive use would be 278 acre-feet per year. The cumulative effect of the express terms of the 1961 and the 1964 decrees (hereinafter "60s decrees") gave Golden the right to divert up to 4.66 c.f.s. of water from May through October of each year.

## B. The 1993 Consolidated Mutual Litigation

As stated previously, Con Mutual and Golden currently own the majority of Priority 12 water.[6] In 1992, Con Mutual applied to change the use of its 2.5855 c.f.s. of Priority 12 water from agricultural to municipal use.[7] However, Con Mutual's decree, like those at issue in the instant case, did not include an express volumetric limitation stated in acre-feet. Golden filed an objection to Con Mutual's proposed change in use. Therein, it argued that Con Mutual's change would injure Golden unless the court imposed a volumetric limitation, expressed in acre-feet per year, on Con Mutual's decree.

5. This 1964 decree also involved a change in point of diversion.

6. While a number of individuals own miniscule portions of the Priority 12 water, none of them are involved in the instant litigation regarding these rights.

7. This proceeding also involved Con Mutual's application for a change in use for several other of its water rights in the Lee, Stewart, and Eskins ditch.

The water court stated that, "in figuring out [Con Mutual's entitlement to Priority 12 water], we have to figure out what Golden got" as a result of the 60s change proceedings. In furtherance of this goal, Golden's expert water engineer, Gary Thompson, prepared a table demonstrating the historical consumptive use of Priority 12 water. In doing so, Thompson relied on the notebooks and calculations that W.W. Wheeler had prepared for the 1960s proceedings. This table fixed the average total annual consumptive use of Priority 12 water at 411 acre-feet. Thompson testified that Con Mutual's share of Priority 12 water could be calculated by subtracting the acre-footage of water transferred to Golden in the 60s proceedings. Based on his calculations, Thompson concluded that Con Mutual was entitled to consume an average of 124 acre-feet of water per year. By implication, Thompson's analysis fixed Golden's share of Priority 12 at an average of 287 acre-feet per year, i.e., 411 acre-feet minus 124 acre-feet.[8] Thompson has subsequently reiterated that his calculations in the Con Mutual case were computed by taking the total amount of historical consumptive use attributable to Priority 12 and "subtract[ing] what Golden's share was."

In the 1993 litigation, the water court agreed with Thompson's calculations and held that a volumetric limitation on Con Mutual's decree was necessary in order to prevent injury to Golden and other users. In its corresponding order, the court adopted the calculations presented by Thompson in his testimony.

## C. The Current Litigation

The current litigation began on September 29, 1995, when the appellants filed a complaint alleging that Golden had infringed on their water rights by impermissibly expanding its use beyond the extent of its decreed rights. Appellants forward three primary claims of injury in support of their request for declaratory relief. First, appellants argue that although the 60s decrees do not contain express volumetric limitations on the amount of Priority 12 water Golden can consume, such a limitation, stated in acre-feet and based upon historical consumptive use, is read into every decree as a matter of law. Appellants claim that Golden has enlarged its use of water under the 60s decrees by consuming a greater volume of water than that to which it is entitled under the implied volumetric limitations of its decrees. As a corollary to this argument, appellants contend that the specific acre-footage limitations by which Golden is bound are embodied in Gary Thompson's testimony in the Con Mutual proceeding. Appellants assert that because the acre-footage limitations associated with Golden's decrees were actually and necessarily decided in the 1993 litigation, Golden is now precluded from relitigating this issue. Furthermore, the appellants allege that Golden is judicially estopped from arguing that Thompson's testimony in the 1993 Con Mutual proceeding does not govern the terms of its decrees.

Second, the appellants argue that Golden has impermissibly enlarged its use of Priority 12 water by changing its use patterns, thereby altering its right from a "peaking flow right," used only to satisfy municipal demand during the peak summer months of lawn irrigation, to a "base flow right," used to satisfy municipal demand outside the summer months.

Third, the appellants claim that Golden has enlarged its use by increasing the acreage of lawns irrigated with its Priority 12 water. Appellants argue that this increase in acreage upsets the balance struck by Wheeler when he crafted the flow rate limitations in the 60s decrees. Specifically, appellants allege that Wheeler's attempt to balance the historical agricultural consumptive use and future municipal consumptive use was based upon the fundamental premise that only thirty-six percent of the Priority 12 water would be applied to lawn irrigation, as lawn irrigation is a highly consumptive use. Appellants assert that Golden has expanded its lawn acreage under irrigation in violation of this premise upon which Wheeler's testimony was

---

**8.** Of this 287 acre-feet, 9 acre-feet is attributable to the small parcel owners of Priority 12, leaving Golden with 278 acre-feet.

based. Appellants contend that by virtue of this expansion, Golden has enlarged its consumptive use of Priority 12 water by approximately thirty-three percent.

In support of their claims, appellants point to a 1994 report which Golden provided to the State Water Commissioner as evidence of its Priority 12 water transfers for that year. This report stated that Golden diverted 865.9 acre-feet of water in 1994. Applying Golden's own estimates of consumptive use to this figure, Golden's 1994 consumptive use was approximately 466.3 acre-feet.[9] Appellants allege that this consumptive use estimate evidences Golden's expanded use of Priority 12 water, as it exceeds Wheeler and Thompson's estimate of the historical consumptive use under the 60s decrees, namely 374 acre-feet. Appellants rely on this allegation of harm in support of their request for a declaratory judgment to modify the 60s decrees and their request for injunctive relief from Golden's alleged expansion of use.[10]

Golden responded by filing a motion to dismiss appellants' claim for the imposition of volumetric limitations on its decrees on the grounds that any such modification is barred by principles of claim and issue preclusion.[11] Therein, Golden alleged that the appellants could not "reopen the 60s decrees in order to impose volumetric limitations upon them." The appellants replied with a cross-motion for partial summary judgment on their issue preclusion and judicial estoppel arguments. The water court heard oral argument on these motions in May 1996.

Soon thereafter, the water court issued a written order denying both motions. It held that the appellants' claims were not barred by claim preclusion because the 60s decrees contained an *implied* limit on the amount of water Golden can divert thereunder. Relying on our holding in *Orr v. Arapahoe Water & Sanitation District*, 753 P.2d 1217, 1226 (Colo.1988), the court held that

> the 60s decrees did not confer upon Golden the right to continuously divert 4.66 c.f.s. of Priority 12 water. Instead, the 60s decrees conferred the right to change the point of diversion ... and to change the use of the water to municipal uses.... The implied limitation that Golden could not expand upon the historical consumptive use of its Priority 12 rights survived the change in use effected by the 60s decrees.

The water court concluded that the appellants' claims were permissible because the injury asserted, Golden's expansion of use, had not been litigated previously. With regard to the appellants' cross-motion for summary judgment, the water court held that Gary Thompson's testimony in the 1993 litigation did not judicially estop Golden from arguing that its decrees should not be modified to reflect volumetric limitations. The water court did not rule on the appellants' allegation that the 1993 litigation has issue preclusive effect in the instant case.

In May 1997, one year after the hearing on Golden's motion to dismiss, the trial began. The water court heard two weeks of argument and expert testimony regarding all three of the appellants' claims of injury. First, the appellants made extensive arguments to the court that, as a matter of law, volumetric limitations must be read into all decrees. Furthermore, the appellants' expert witness testified that Golden has expanded its pattern of Priority 12 usage from a peaking flow right to a base flow right. Finally, the appellants' expert witness testified that Golden has significantly increased

---

9. All estimates of Golden's present-day municipal consumption factors have been obtained from Golden's 1986 plan for augmentation filed in Case No. 83CW361.

10. The parties to the instant litigation agree that Golden has not expanded its use of Priority 12 water beyond the express flow limitations set forth in the 60s decrees.

11. We prefer to use these terms rather than "res judicata" and "collateral estoppel." In prior opinions, we have used the phrase "claim preclu-

sion" interchangeably with res judicata and the phrase "issue preclusion" interchangeably with collateral estoppel. *See, e.g., Dale v. Guaranty Nat'l Ins. Co.*, 948 P.2d 545, 549 (Colo.1997). However, as the United States Supreme Court has noted, such usage may lead to confusion, as res judicata is oftentimes used as an overarching label for both claim and issue preclusion. *See Migra v. Warren City Sch. Dist. Bd. Of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *see also Robi v. Five Platters, Inc.*, 838 F.2d 318, 321 n. 2 (9th Cir.1988).

the lawn acreage it irrigates with Priority 12 water. For instance, by referencing Wheeler's analysis, one expert testified that the first change decree in 1961 was based on the assumption that Golden would only irrigate 138 acres of lawn under the decree.[12] This expert then testified that, based on his engineering analysis, Golden is currently irrigating approximately 184 acres of lawn under the first of the 60s decrees. Golden responded to the appellants' evidence with extensive testimony by Gary Thompson regarding Golden's consumptive use under the 60s decrees.

The court issued its final order in August 1997. In that order, the court reversed its May 1996 holding that the 60s decrees were subject to implied volumetric limitations. In so doing, the court distinguished Orr, 753 P.2d 1217, the case upon which it had previously relied. The court concluded that, contrary to its initial impression, Orr did not hold that all decrees are subject to implied volumetric limitations as a matter of law. Instead, the court found that Orr only requires courts to imply volumetric limitations in decrees when historical consumptive use was not at issue in an earlier proceeding.

Applying this interpretation of Orr to the instant case, the water court concluded that because both the historical agricultural consumptive use and the future municipal consumptive use associated with Golden's rights were fully litigated in the 60s proceedings, it could not imply volumetric limitations into those decrees. The court reasoned that the 60s decrees could not be "subject to modification by collateral attack" in the present proceedings. Furthermore, the court rejected the appellants' attempt to use the doctrines of issue preclusion and judicial estoppel to bind Golden to Thompson's testimony in the 1993 Con Mutual case.

With regard to the appellants' claim that Golden has enlarged its consumptive use of Priority 12 by changing the right from a peaking flow right to a base flow right, the water court found the testimony of Golden's expert, Gary Thompson, most convincing.

Therefore, the court adopted Thompson's opinion that there has been "no significant change" in Golden's pattern of municipal use over the past 40 years.

Notably, the water court made no findings and issued no ruling on the appellants' third claim of enlarged consumptive use based on increased lawn acreage under irrigation. This appeal followed.

II.

A short review of the history of change decrees informs our analysis of the issues in this case. "Colorado has been firmly committed to the use of volumetric limitations in over-appropriated basins since the passage of the 1969 Water Right Determination and Administration Act." James N. Corbridge, Jr., Historical Water Use and the Protection of Vested Rights: A Challenge for Colorado Water Law, 69 U. Colo. L.Rev. 503, 525 (1998). However, prior to the modern trend of implementing express volumetric limitations in decrees, most water rights were quantified by a two-part measurement. See id. at 508–509. First, a decree contained a flow-rate of water, in c.f.s., which the owner was entitled to divert from the stream. Second, a decree stated the use to which that diverted water could be put, such as irrigation of crops or municipal uses.

When a petition for a change in use or point of diversion is filed, junior appropriators are given the opportunity to object to the change on the grounds that it will encroach upon their vested water rights. See Farmers Highline Canal & Reservoir Co. v. City of Golden, 129 Colo. 575, 580, 272 P.2d 629, 632 (1954). It is the water court's duty to hear testimony regarding the alleged injurious effects of the change and aid the parties in crafting decree conditions to prevent such injury. See Mannon, 145 Colo. at 390–91, 360 P.2d at 423.

From the late 1800s to the early 1970s, courts primarily employed one standard method in order to protect the vested rights of juniors in change proceedings. See Cor-

12. This conclusion is supported by our opinion in Mannon v. Farmers' High Line Canal & Reservoir Co., 145 Colo. 379, 386, 360 P.2d 417, 421 (1961), in which we noted that Golden planned to irrigate 138 acres of lawn with the Priority 12 water right at issue in that proceeding.

bridge, 69 U. Colo. L.Rev. at 513. Under this method, the court would order the petitioner to abandon a portion of his or her originally decreed flow right back to the stream. This flow abandonment was then incorporated into the express terms of the change decree. However, many of the change decrees entered under this system have proven inadequate to prevent injury to junior users. *See id.* at 521. Furthermore, many of the early Colorado decrees awarded rates of flow in excess of the amounts necessary for the petitioner's beneficial use, and some even went so far as to grant more water than a particular ditch would carry. *See id.*

■ The foregoing practice is inconsistent with one of the most basic tenets of water law, namely, that water rights are usufructuary. *See Dallas Creek Water Co. v. Huey,* 933 P.2d 27, 34 (Colo.1997). A water right comes into existence only by applying waters to a beneficial use. *See id.* Water rights decrees grant a legal right to the *use* of water, not an ownership interest in the water itself. *See Humphrey v. Southwestern Dev. Co.,* 734 P.2d 637, 640 (Colo.1987); *Sterling v. Pawnee Ditch Extension Co.,* 42 Colo. 421, 426, 94 P. 339, 340 (1908). Moreover, water which has never been applied to a beneficial use has not ripened into an appropriation. *See Green v. Chaffee Ditch Co.,* 150 Colo. 91, 104, 371 P.2d 775, 782 (1962). Therefore, many of the decrees entered under the older injury-prevention method of flow rate abandonment conflict with fundamental concepts underlying our state's system of water rights administration.

With the advent of improved engineering techniques, courts began to utilize another approach to prevent injury to juniors in change proceedings. *See* Corbridge, 69 U. Colo. L.Rev. at 512. Under the modern method, courts now translate the petitioner's historical consumptive use into a volumetric limitation stated in acre-feet. Courts then incorporate the volume limit into the express terms of the decree. *See id.* Therefore,

most modern change decrees impose an acre-foot limit on the amount of water an appropriator may consume in the average year.

This shift in the methods employed to protect juniors in change proceedings accounts for the difference between Golden's decrees, granted in the early 1960s, and Con Mutual's change decree, granted in 1993. Whereas the 60s decrees only required Golden to abandon a portion of its flow entitlement in order to protect junior users, Con Mutual's decree imposed a volumetric limit on the amount of Priority 12 water it is entitled to consume.[13]

This particular trend in engineering techniques is of great importance to the instant case, as it provides the background for our analysis of the preclusive effect of the 1960s proceedings.

Due to the unique nature of water law, the litigation surrounding water rights decrees commonly raises complex problems of claim and issue preclusion. As evidenced by this case, during the course of its existence, a single water decree may be involved in a multitude of court actions, including petitions for change in use or point of diversion, declaratory actions seeking to enjoin an owner from enlarging his or her use, and actions seeking to declare an abandonment. In addition, the engineering methods employed to quantify rights in earlier proceedings are less accurate and reliable than those currently available. As a result, the traditional analytical framework employed to determine whether a previous action operates as a bar to a current claim must be tailored specifically to suit the context of water decrees. Tension exists between the mandate requiring courts to give preclusive effect to purportedly final decrees entered in previous actions and the need to leave the courthouse door open to petitioners who allege new injury as a result of another's enlarged use.

## III.

■ With the foregoing principles of water law in mind, we now turn to our analy-

---

**13.** As stated above, volumetric limitations have been the preferred method for preventing injuries to junior users since 1969. However, it has been argued that volumetric limits do not offer superior protection over the traditional method of flow and use limitations. *See* Corbridge, 69 U. Colo. L.Rev. at 525, citing George A. Gould, *Water Rights Transfers and Third Party Effects,* 23 Land & Water L.Rev. 5–12 (1988).

sis of the appellants' three claims of injury in the instant case.[14] In essence, the appellants request relief from three different alleged expansions of use by Golden. The appellants first ask us to add volumetric limitations to the express terms of the 60s decrees. They argue that if volumetric limitations are read into the 60s decrees, they are entitled to injunctive relief, as Golden has enlarged its current annual acre-footage consumption beyond said limitations. We conclude that we cannot reach the merits of this request, as this claim is precluded by the 60s litigation.

The appellants' second and third claims for injunctive relief allege that Golden has enlarged its use of Priority 12 water under the 60s decrees by altering the right from a peak flow right to a base flow right and by increasing the acreage of lawn irrigated with the right. We hold that these allegations regarding Golden's alleged enlarged use of Priority 12 water are not precluded, as they represent new claims of injury not litigated in the 60s proceedings.

*A. Appellants' First Claim of Enlarged Use—Consumptive Use Beyond Implied Volumetric Limitations*

Appellants' first claim in support of their request for declaratory relief is that Golden has enlarged its consumption of Priority 12 water beyond the implied volumetric limitations in the 60s decrees. Appellants allege that these implied volumetric limitations exist in every water decree by operation of law. Furthermore, appellants argue that they are entitled to a modification of the 60s decrees so that these volumetric limitations may be added to the express terms of those decrees. Golden, however, asserts that

the appellants' allegation that the 60s decrees should include acre-footage limitations on the volume of water that it can consume thereunder is barred by principles of claim preclusion. We agree.

Claim preclusion bars a subsequent action only if, as between prior and present suits, there exists an identity of subject matter, claim or cause of action, parties to the action, and capacity in the persons for which or against whom the claim is made. *See Weibert v. Rothe Bros.*, 200 Colo. 310, 318, 618 P.2d 1367, 1372 (1980); *City of Westminster v. Church*, 167 Colo. 1, 8, 445 P.2d 52, 55 (1968). The same claim or cause of action requirement is bounded by the injury for which relief is demanded, and not by the legal theory on which the person asserting the claim relies. *See State Eng'r v. Smith Cattle, Inc.*, 780 P.2d 546, 549 (Colo. 1989).

We have been careful to emphasize that a mistake in a prior decree is not a valid basis for relitigation. *See Closed Basin Landowners Ass'n v. Rio Grande Water Conservation Dist.*, 734 P.2d 627, 637 (Colo. 1987). A water court has jurisdiction to render an erroneous decision, which may be reviewed on appeal. Consequently, a judgment entered within the jurisdiction of the court, even if wrong, is not subject to collateral attack. *See Smith Cattle*, 780 P.2d at 549; *see also In re Application for Water Rights of Midway Ranches Property Owners Ass'n*, 938 P.2d 515, 524 (Colo.1997).

Appellants argue that their claim requesting the addition of volumetric limitations to the 60s decrees is not precluded because, as a matter of law, the 60s decrees contain

**14.** In addition to the three primary claims of injury that we will address in this section, the appellants allege that the 60s decrees are ambiguous and require interpretation by this court. Appellants assert that when the 60s decrees are interpreted in light of extrinsic evidence, including Wheeler's testimony in the 60s proceedings, they contain implied volumetric limitations. It is well-settled that when a document is unambiguous, it cannot be varied by extrinsic evidence. *See USI Properties East, Inc. v. Simpson*, 938 P.2d 168, 173 (Colo.1997). Furthermore, it is fundamental that a decree should be complete and certain in itself. *See Hinderlider v. Canon Heights Irrigation & Reservoir Co.*, 117 Colo. 183,

189, 185 P.2d 325, 327–28 (1947). Absent a finding of ambiguity, we will not look beyond the four corners of the agreement in order to determine the meaning intended by the parties. *See USI Properties East*, 938 P.2d at 173. In determining whether a provision in a decree is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used. *See Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo.1990). As the plain meaning of the express terms of the 60s decrees is clear and unambiguous, we must reject the appellants' request for interpretation of these documents.

implied volumetric limitations. In support of this contention, the appellants urge us to extend the rule first announced in *Orr*, 753 P.2d 1217, to the facts of the instant case. However, as we decline to extend the rule in *Orr*, we find the appellants' claim that volumetric limitations should be added to the 60s decrees is precluded.

The *Orr* case originated when the owner of four water rights petitioned to change the point of diversion of those rights from ditches to wells.[15] This change was formally adjudicated in a 1969 proceeding, wherein a new decree was issued. Notably, "[n]o evidence was presented at the 1969 hearing concerning the amount of land actually irrigated or the amount of water consumptively used in irrigating the land either through the ditches or the wells." *Id.* at 1220. In fact, the only evidence submitted at the 1969 proceeding that was even remotely related to consumptive use was testimony to the effect that the water rights in question had been used for irrigation. *See id.* The 1969 decree approved the change in point of diversion from ditches to wells, but contained *no flow rate or volumetric limitation* on the owner's rights. *See id.*

From 1956 to 1979, the owner of the disputed water rights logged an annual consumptive use of 682 acre-feet. *See id.* at 1221. In 1981, the owner petitioned for a change from agricultural use to municipal use. Several parties filed statements of opposition. These parties argued that the 1981 decree could only grant the owner the right to consume 282 acre-feet of water per year, as that was the historical consumptive use associated with the rights at issue. *See id.* We agreed. *See id.* at 1224. In doing so, we rejected the owner's argument that the 1969 decree was preclusive as to the issue of historical consumptive use. *See id.* at 1226. We held that because no evidence was presented during the prior proceeding concern-

ing the historical use of the decreed rights, that proceeding could not function as a bar to a current claim that the owner had recently enlarged his use. *See id.* In so holding, we noted that "[t]he fact that the 1969 decree did not expressly limit the well diversions to the amount of water historically diverted through the ditches is not controlling, since such a limitation is read into every water decree by implication."[16] *Id.* at 1224.

We recently revisited the *Orr* doctrine of implied limitations and its attendant effect on the issue of claim preclusion in *Midway Ranches*, 938 P.2d 515. In *Midway Ranches*, we considered the preclusive effect of a prior quantification of historical consumptive use on a subsequent plan for augmentation. We summarized the *Orr* holding, to wit:

> All water rights are subject to beneficial use as the measure of the right. When prior change decrees are subject to interpretation in subsequent change proceedings, *the ordinary interpretation to be made in the absence of a quantification or otherwise controlling terms* of a prior judgment is that historic usage … governs the extent of usage under the change decree.

*Id.* at 523 (citations omitted) (emphasis added). We further noted that the implied volumetric limitation rule from *Orr* only applies when "the historical usage of the original surface irrigation rights [has] not been determined previously." *Id.*

In *Midway Ranches*, we concluded that "[u]nlike the circumstances in *Orr*, … historic usage of the [disputed] water rights was determined in previous water court cases." *Id.* Therefore, we held that claim preclusion barred the parties from relitigating the historical usage of the right at issue. *See id.* at 525. However, we emphasized that claim preclusion does not prevent the water court from determining historical consumptive use

---

**15.** The decrees at issue in *Orr* originated in the late 1800s and stated only flow limitations on the owner's rights. *See Orr v. Arapahoe Water & Sanitation District*, 753 P.2d 1217, 1220 (Colo. 1988).

**16.** The *Orr* opinion relied heavily on language from *City of Westminster v. Church*, 167 Colo. 1,

445 P.2d 52 (1968). In *Church*, we held that a prior proceeding permitting an owner to change headgates was not preclusive of a subsequent suit brought to enjoin the owner's change in use from intermittent agricultural use to continuous municipal use. *See id.* at 10, 445 P.2d at 56.

when such has not been determined in a previous proceeding. *See id.*

An examination of *Orr* and *Midway Ranches* reveals the proper standard for our review. In each individual case, we must review the record of the prior proceeding in order to determine whether historical consumptive use was calculated and relied upon in the formation of the earlier decree. If so, we will not modify the resulting decree by implying volumetric limitations into its terms. The implied volumetric limitation doctrine in *Orr* was developed in order to prevent injury to juniors when a prior change decree did not address or contemplate the question of historical consumptive use. *See Orr,* 753 P.2d at 1217; *Weibert,* 200 Colo. at 318, 618 P.2d at 1372–73. This doctrine was not developed in order to provide juniors with a method to insert volumetric limitations where they were previously absent, even though historical consumptive use formed the basis for the earlier decree.

Our application of this rule to the case before us is simplified by appellants' concession that Wheeler's estimates of the historical consumptive use of Priority 12 formed the basis for the terms of the 60s decrees. In fact, appellants admit that Wheeler's flow rate calculations were based on his attempt to "balance" the amount of water consumed by the previous owners of the irrigation right with the amount of water that would be consumed by Golden's municipal use of the water. Wheeler concluded that his calculations, which required a partial abandonment of flow back to the stream, were sufficient to prevent injury to junior appropriators. These calculations were ultimately incorporated into the resulting decrees. During the trial in the instant litigation, appellants' experts agreed that the purpose of the abandonment provisions in the 60s decrees was to match historical use to future use and to prevent injury as a result of expanded use. Therefore, there is no dispute as to whether Wheeler's calculations formed the basis for the terms of the 60s decrees.[17]

17. As the appellants have conceded that Wheeler's historical consumptive use calculations also formed the basis for the second decree, our inquiry is satisfied. Therefore, we do not address

Accordingly, we cannot reopen the 60s decrees in order to modify their express terms to reflect volumetric limitations based upon historical consumptive use, as such a request is precluded by the 60s proceedings.

Appellants also argue that the doctrines of issue preclusion and judicial estoppel support their request for the imposition of volumetric limitations. Specifically, the appellants argue that these principles should bind Golden to the acre-footage limitations on the 60s decrees to which Gary Thompson testified in the 1993 Con Mutual litigation.

First, we find that the doctrine of issue preclusion is unavailable to the appellants in this case. Appellants contend that Golden is precluded from asserting that the 60s decrees contain no volumetric limitations because the 1993 Con Mutual case adjudicated the historical consumptive use of Golden's rights on a volumetric basis. However, in light of our holding in this case that the 60s decrees may not be reopened to permit the addition of volumetric limitations, the 1993 Con Mutual proceedings cannot accomplish that which is barred by virtue of claim preclusion.

If we were to allow the 60s decrees to be reopened for the addition of volumetric limitations, then the appellants' argument that the 1993 litigation collaterally establishes the appropriate acre-footage terms of these decrees would be relevant. However, as we will not reopen the 60s decrees in order to imply volumetric limitations, the appellants' reliance on issue preclusion is misplaced. Accordingly, we affirm the water court's dismissal of the appellants' cross-motion for summary judgment as to issue preclusion.

With respect to appellants' judicial estoppel argument, we agree with the water court's conclusion that the doctrine is inapplicable to the instant case. The doctrine of judicial estoppel is applied to prevent a prevailing party, as a matter of law, from adopting a legal position which conflicts with an earlier position taken in the same or

the issue of whether a water consent decree entered into in the absence of a trial on the record can have claim preclusive effect.

related litigation. *See Estate of Burford v. Burford,* 935 P.2d 943, 948 (Colo.1997). At a minimum, the following five circumstances are required in order for the doctrine to apply: (1) the two inconsistent positions must be taken by the same party or parties in privity with each other; (2) the positions must be taken in the same or related proceedings involving the same parties or parties in privity with each other; (3) the party taking the positions must have been successful in maintaining the first position and must have received some benefit in the first proceeding; (4) the inconsistency must be part of an intentional effort to mislead the court; and (5) the two positions must be totally inconsistent—that is, the truth of one position must necessarily preclude the truth of the other position. *See id.*

In the instant case, the water court concluded that Golden did not take inconsistent positions in the 1993 case and the present litigation, that the 1993 proceeding was not the "same or related proceeding" as the instant litigation, and that Golden did not receive a benefit as a result of the 1993 litigation. We conclude that the water court's reasoning is sound. In particular, we note that during cross-examination of Gary Thompson in the 1993 proceeding, he admitted that although he urged the imposition of volumetric limitations on Con Mutual's decree, there was "no such [acre-footage] limit" on Golden's decrees. Moreover, during closing argument, counsel for Golden emphasized the fact that Golden's decrees did not contain volumetric limitations.

We agree with the appellants that Gary Thompson's testimony in the 1993 proceeding, in which he impliedly fixed the acre-footage of Golden's decrees at 278 acre-feet, contradicts the closing argument of Golden's counsel in that case, in which the existence of any volumetric limitations on Golden's decrees was clearly denied. However, the proper forum in which to address this inconsistency was the 1993 proceedings, not the instant litigation. We cannot conclude that this conflict in the 1993 litigation meets the "inconsistent position" requirement necessary for the imposition of judicial estoppel, as Golden has taken the *same* position in both

the 1993 case and the instant litigation, namely, that its decrees are not subject to volumetric limitations. Therefore, we must reject the appellants' judicial estoppel argument.

*B. Appellants' Second and Third Claims of Enlarged Use—Base Flow Usage and Expanded Lawn Acreage Under Irrigation*

Appellants make two additional claims in support of their allegation that Golden has enlarged its use of Priority 12 water. First, the appellants argue that Golden has enlarged its use of Priority 12 by altering its traditional pattern of water usage from that of a peaking flow right to a base flow right. Second, the appellants contend that Golden has enlarged its use of Priority 12 by expanding the acreage of lawn it irrigates with water diverted under the 60s decrees.

■ Golden argues that, like the appellants' claim for implied volumetric limitations, these claims of enlarged use are precluded by the 60s proceedings. We disagree.

■ While it is true that a decree for change in use may not again be collaterally attacked insofar as previously litigated injurious effects are concerned, *see City of Colorado Springs v. Yust,* 126 Colo. 289, 296, 249 P.2d 151, 154–55 (1952), this does not bar junior appropriators from bringing later suits regarding new injuries that were not previously litigated and which arose after the change was decreed. *See Orr,* 753 P.2d at 1226; *Church,* 167 Colo. at 8, 445 P.2d at 55. We have held that "[w]here an owner of decreed rights, after obtaining a decree permitting a change in point of diversion, enlarges or attempts to enlarge the use of his water rights to the injury of other appropriators, the permissive decree does not bar relief to the latter." *Church,* 167 Colo. at 9, 445 P.2d at 55; *see also Weibert,* 200 Colo. at 317–18, 618 P.2d at 1372; *Dry Creek No. 2 Ditch Co. v. Coal Ridge Ditch Co.,* 109 Colo. 556, 565, 129 P.2d 292, 296 (1942); *New Cache La Poudre Irrigating Co. v. Water Supply & Storage Co.,* 74 Colo. 1, 6, 218 P. 739, 741 (1923).

Furthermore, "[t]he best and most accurate test as to whether a former judgment is a bar in subsequent proceedings ... is whether the same evidence would sustain both, and if it would the two actions are the same, and this is true, although the two actions are different in form." *Pomponio v. Larsen*, 80 Colo. 318, 321, 251 P. 534, 536 (1926).

Finally, in *Midway Ranches*, 938 P.2d 515, we emphasized that while a previous determination of consumptive use precludes future relitigation of that element, claim preclusion does not bar the water court from addressing circumstances which have changed subsequent to the previous decree proceedings and which have not been litigated. *See id.* at 525.

In the instant case, these principles of law dictate that the appellants' second and third claims of enlarged use are not precluded by virtue of the 60s proceedings. As Golden's municipal use had not even been decreed at the time of the 60s proceedings, it is obvious that the appellants could not have brought their claims of enlarged use based on changing municipal use patterns and increased lawn irrigation. Furthermore, the appellants' second and third claims of enlarged use in the instant case are sustained by different evidence than that presented in the 60s proceedings. As the water court is not precluded from considering new claims of injury based on allegations of changed circumstances, the appellants' allegations of enlarged use in the instant case are permissible.

Particularly relevant to our holding on this issue is the seminal case of *Enlarged Southside Irrigation Ditch Co. v. John's Flood Ditch*, 116 Colo. 580, 183 P.2d 552 (1947). In that case, the Enlarged Southside Irrigation Ditch Company brought an action for injunctive relief from the defendant's alleged enlarged use of a decreed right. The defendant asserted that the plaintiff's claim was precluded by prior litigation in which the right was decreed. In allowing the plaintiff's claim, we noted that

> [t]he owner of a priority for irrigation has no right, as against a junior appropriator, to waste it; neither has he the right to increase the amount or extend the time of

his diversion to enable him to put it to double use *by irrigation of other lands in addition to those for which it was appropriated.*

*Id.* at 586, 183 P.2d at 554 (emphasis added).

Therefore, in the instant case, Golden may not enlarge the use of its decreed rights by changing its pattern of municipal use or by using its water to irrigate lawn acreage which was not anticipated at the time its change in use decree was entered. As it would contradict the most basic principles governing all water decrees were we to allow a party to enlarge its use in such a manner, we must reject Golden's assertion that the appellants' second and third enlarged use claims are precluded.

Accordingly, we conclude that the appellants' current claims of enlarged use due to changing patterns of municipal use and increased lawn irrigation constitute allegations of changed circumstances sufficient to defeat Golden's assertion of claim preclusion. As we hold that the appellants' claims of enlarged use are not precluded, we now address the merits of these claims.

As noted above, the water court heard extensive expert testimony regarding the appellants' second and third claims of enlarged use. With regard to the appellants' claim that Golden has enlarged its use by changing its municipal use patterns from peak use to base flow use, the water court was adequately convinced by Gary Thompson's testimony to the contrary. Given the factual nature of the injury inquiry, the water court's factual conclusions based thereon cannot be disturbed on appeal if they are supported by the record. *See City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 89 (Colo.1996). As we find ample support for the water court's factual conclusions in the record, we defer to its findings and ruling on this issue.

However, the water court made no findings or ruling with regard to the appellants' claim that Golden has enlarged its use by increasing the percentage of Priority 12 water used to irrigate lawns. In light of compelling testimony from the appellants' expert witness to this end, we remand to the

water court for a determination of the validity of this claim of injury.

## IV.

We hold that the water court was correct to dismiss the appellants' claim requesting the addition of volumetric limitations to Golden's 60s decrees, as this claim is precluded by the 60s litigation. We further hold that the water court did not err in finding that Golden has not enlarged its use by transforming its Priority 12 rights from a peaking flow right to a base flow right. Moreover, we hold that the appellants' claim that Golden has enlarged its use by expanding the acreage of lawn irrigated with Priority 12 water is not precluded by the 60s proceedings.[18]

Accordingly, we remand to the water court for a determination of whether Golden has expanded the percentage of Priority 12 water that it applies to lawn irrigation, thereby impermissibly enlarging upon its decreed rights. Such a determination should be based on the evidence already taken at trial, together with such additional evidence the trial court may permit the parties to offer. If the water court concludes that such an expansion has occurred, it should issue an injunction limiting the percentage of Priority 12 water Golden uses for lawn irrigation to the percentage relied upon by Wheeler in the 60s proceedings.[19]

Justice HOBBS does not participate.

---

**18.** As Golden has not prevailed on this appeal, we do not address its cross-appeal for breach of contract damages under the 60s decrees.

**19.** We note that at trial, there was a significant dispute as to the admissibility of Wheeler's engineering studies and handwritten notes from the 60s proceedings. We emphasize that, insofar as these documents contain information regarding the amount of lawn acreage that Wheeler assumed in formulating the 60s decree provisions, they are relevant under CRE 401, 402, and 403.